UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PACIFIC MARKET, INC., a Washington corporation, d/b/a PACIFIC MARKET INTERNATIONAL,

    Plaintiff,

v.

THERMOS L.L.C., a Delaware limited liability company,

    Defendant.

CASE NO. C03-1261JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on Defendant Thermos LLC's ("Thermos") Motion for Summary Judgment (Dkt. # 37). Having reviewed all of the pleadings filed in support of and in opposition to the motion, the court DENIES Thermos' motion for summary judgment.

## II. BACKGROUND

Plaintiff Pacific Market, Inc. ("PMI") has filed suit against Thermos alleging trade dress infringement in violation of the Lanham Act, the Washington Consumer Protection Act, and common law. Sec. Amend. Compl., Dkt. # 49. Both PMI and Thermos manufacture and sell steel, vacuum-insulated bottles used to store and transport food and

ORDER – 1

beverages.[1] PMI alleges that Thermos' product infringes on the Stanley bottle trade dress. PMI acquired the intellectual property rights to manufacture the Stanley bottle from its predecessor in interest, Aladdin Industries, in early 2002.

The Stanley bottle dates back to its invention in 1913 by William Stanley. Since 1953, the Stanley bottle has allegedly maintained the same overall look and appearance, including: (1) a base substantially similar in diameter to the body of the bottle, (2) a body with a crinkled, "hammertone" finish, (3) a tapered, "torpedo like" shape from bottom to top, and (4) a base and top with a stainless steel finish in contrast to the body color. Id., ¶ 8. PMI and its predecessors in interest have allegedly sold millions of products bearing this look and appearance, primarily to blue collar and trade workers. Over the years, PMI alleges that the Stanley trade dress has become an icon of American culture, featured in movies such as Office Space, magazines such as Forbes, American Style, and Town and Country, and advertisements for other products such as the Toyota Tundra4.

It is uncontested that in 1996, Thermos began taking steps to design a vacuum-insulated bottle to compete specifically with the Stanley bottle for the blue collar market. Thermos first developed a bottle called "The Rock," a stainless steel, matte-finish bottle with a large black handle firmly locked in place and attached to large black plastic strips circling the bottle's base and body. Although "The Rock" achieved some success, it did not win the hoped-for market share. As a result, Thermos returned to the drawing board and began developing the admitted "Stanley Attack" or "Stanley Killer" plan which

---

[1] The court notes that at least four bottles are at issue in this case, including the: (1) "Stanley Classic Tall Bottle," (2) "Stanley Classic Wide Bottle" (an accompanying food storage bottle), (3) "Thermos Work Series Bottle," and (4) "Thermos Work Series Food Bottle" (an accompanying food storage bottle). Sec. Amend. Compl., ¶¶ 5, 10, Exh. A-D. Given that the parties have focused their summary judgment briefing on the "Stanley Classic Tall Bottle" and "Thermos Work Series Bottle," the court has focused its analysis on these bottles, even though its ruling applies to all four bottles.

ORDER – 2

ultimately resulted in the Thermos "Work Series" bottle at issue in this case. McMinimee Decl., Exh. 11, 17-22 (Thermos deposition testimony, emails, memos).

During the product design phase, Thermos hired an outside design company to assist in the process who proposed eight different designs which it believed could compete with the Stanley bottle while avoiding litigation. Thermos submitted the designs to "focus group" testing, surveying only Stanley bottle owners to find out what they preferred. Of the two designs liked best, Thermos allegedly chose the one that most resembled the Stanley bottle. A Thermos employee stated in an email that the "Stanley attack bottle should be very similar to the Aladdin look (within the law)" and "green in color – very similar to the Stanley bottle." McMinimee Decl., Exh. 20.

Ultimately, the final version of Thermos' competing "Work Series" bottle incorporated product design features also present in the Stanley bottle, including matching stainless steel, "mirror" finishes on the cup and base, a "hammertone" finish on the body, a base substantially similar in diameter to the body, and an overall tapered shape from bottom to top. Thermos indicated to senior management and sales representatives that the "rationale" for choosing a hammertone paint finish for the bottle, and stainless steel, mirror finish for the base and cup, was to provide a "familiar visual link" to the Stanley bottle. Id., Exh. 30-31. The new Thermos "Work Series" bottle, however, also incorporated different features than the Stanley bottle, including a different bottle color, label, cup shape, height, and handle attached by two black rubber bands circling the bottle's body.[2]

---

[2]The "Work Series" bottle also differs from the Stanley bottle in weight, storage capacity, and the addition of a black rubber footpad on the bottom of the bottle. These differences, however, are not apparent when evaluating the "overall visual impression" created by the Thermos bottle as the court must under Ninth Circuit jurisprudence. Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir. 2001).

ORDER – 3

After Thermos introduced the "Work Series" bottle into Target Stores in August 2002, PMI allegedly experienced a dramatic decrease in sales of the Stanley bottle. PMI responded to the alleged attack by increasing marketing efforts, reducing the wholesale price of the Stanley bottle, and eventually filing this action for trade dress infringement. Thermos denies infringing on or attempting to copy Stanley's alleged trade dress, filing this motion for summary judgment.

### III.   ANALYSIS

**A.   Legal Standard**

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial responsibility, the burden shifts to the non-moving party to establish that a genuine issue as to any material fact exists. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Evidence submitted by a party opposing summary judgment is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. See U.A. Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1995). "[A] complete failure of proof concerning an

ORDER – 4

essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23.

**B.    Trade Dress Infringement**

PMI's trade dress infringement claim arises under section 43(a) of the Lanham Act which provides a cause of action against any person who uses a symbol or device that is likely to cause confusion as to the origin of the goods. 15 U.S.C. §1125(a). Although not explicit in the text, this provision protects "trade dress," a category that includes the packaging and design of a product.[3] Wal-Mart Stores, Inc. v. Samara Bros., Inc. 529 U.S. 205, 209 (2000). The Ninth Circuit has defined trade dress as the "total image, design, and appearance of a product." Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1257 (9th Cir. 2001). It can include features such as "size, shape, color, color combinations, texture or graphics." Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822 (9th Cir. 1993) (internal quotation marks and citations omitted). While evaluating a trade dress claim, the court must focus on the "overall visual impression" created by the alleged trade dress and not focus on the "individual constituent parts." Clicks Billiards, 251 F.3d at 1259.

Here, PMI alleges that the Stanley trade dress consists of the following external features:

---

[3]Although a product's packaging may receive protection under trade dress law, PMI has not asserted that its packaging is a part of its alleged trade dress and as a result, the court has not evaluated it. Sec. Amend. Compl., ¶ 8. Further, both parties note that the Stanley and Thermos bottles are not necessarily maintained in their packaging when they are advertised or displayed and the parties focus their briefing almost exclusively on the bottles as they appear outside their packaging. Regardless, the Ninth Circuit has held that likelihood of confusion, a required element for establishing trade dress protection, can occur after the product has been purchased and appears outside of its packaging. Karl Storz Endoscopy-Am., Inc. v. Surgical Tech., Inc., 285 F.3d 848, 854 (9th Cir. 2002).

ORDER – 5

(1) a base of constant diameter substantially throughout its length; and (2) a body bearing a crinkled finish with a solid color; and at least one of the following additional elements: (a) a top or cap with a color that contrasts with the color of the body; (b) a top or cap and band at the base of the body bearing the appearance of a stainless steel finish; (c) a band at the base of the body bearing the appearance of a stainless steel finish; (d) a tapered or torpedo like overall look and appearance from bottom to top generated from the top or cap being a diameter that is less than the body; or (e) a band at the base of the top or cap with a color that substantially matches the color of the body.

Sec. Amend. Compl., ¶ 8. To sustain a claim for trade dress infringement, PMI must prove: (1) Stanley's trade dress is nonfunctional, (2) has acquired a secondary meaning[4], and (3) that Thermos' product creates a likelihood of consumer confusion. 15 U.S.C. § 1125(a); Clicks Billiards, 251 F.3d at 1258; Samara Bros., 529 U.S. at 210. In Washington, trade dress infringement constitutes unfair competition in violation of the Washington Consumer Protection Act. See Nordstrom v. Tampourlos, 733 P.2d 208, 210-12 (Wash. 1987) (holding that trade name infringement constitutes unfair competition). Thus, PMI's three claims for relief center around establishing trade dress infringement.

### 1. Functionality

To receive trade dress protection, PMI must first demonstrate that Stanley's alleged trade dress is not functional. 15 U.S.C. § 1125(a)(3). A trade dress is functional if it is essential to a product's "use or purpose . . . or if it affects the cost or quality . . . ." Clicks Billiards, 251 F.3d at 1258 (quoting Qualitex Co. v. Jacobson Prods. Co., Inc., 514 U.S. 159, 165 (2001)). The two major policy reasons underlying this requirement are to promote competition by keeping useful product shapes and features in the public domain, and to avoid conflicts with patent law which gravitates against "perpetually protecting a product's utilitarian features." Cont'l Lab. Prods., Inc. v. Medax Int'l, Inc., 114 F. Supp. 2d 992, 1014 (S.D. Cal. 2000) (citing Qualitex, 514 U.S. at 164-65; Leatherman Tool

---

[4]The court notes that the second element may also be established by proving that the trade dress is "inherently distinctive." Clicks Billiards, 251 F.3d at 1258.

ORDER – 6

Group, Inc. v. Cooper, Indus., Inc., 199 F.3d 1009, 1012 (9th Cir. 1999)). "Functionality is a question of fact, reviewed under the clearly erroneous standard." Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 614 (9th Cir. 1989) (citations omitted).

Under Ninth Circuit jurisprudence, the court must consider the following four factors in a functionality analysis: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." Clicks Billiards, 251 F.3d at 1260 (quoting Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d, 1006 (9th Cir. 1998)). A trade dress may be determined not functional as a whole, even though it contains individual elements that are functional.[5] Id., at 1259.

Here, Thermos argues that Stanley's trade dress is functional based on the bottle's overall configuration, the chrome base designed to prevent rust, the "hammertone" finish designed to disguise scratches and smudges, and an advertising expert's opinion that the shape of the Stanley bottle is functional.[6] Def. Mot. for Summ. J., at 9-10. Relying largely on outdated precedent, Thermos fails to identify and apply the four-factor functionality analysis set forth by the Ninth Circuit and rooted in Supreme Court precedent. Clicks Billiards, 251 F.3d at 1258-60; Qualitex, 514 U.S. at 165.

In response, PMI offers extensive expert testimony from an industrial design engineer, who concludes that the alleged Stanley trade dress is not functional as a whole, nor are its individual elements. Applying the Ninth Circuit's four-factor functionality

---

[5]For example, the Ninth Circuit reasoned in Clicks Billiards that many elements of the plaintiff's alleged trade dress were functional, such as the lamps illuminating the pool tables and the counters providing a place for customers to rest their drinks, but the plaintiff could "claim[ ] as its mark the particular combination and arrangement of design elements that distinguish it from others using the same concept." 251 F.3d at 1259 (internal quotations omitted).

[6]PMI disputes the value this testimony given that the expert admitted at his deposition that he is an expert in advertising and brands, and not functionality. McMinimee Decl., Exh. 34.

ORDER – 7

analysis, PMI's expert provides substantial evidence that the alleged Stanley trade dress does not yield a utilitarian advantage (first functionality factor) or result from a comparatively simple or inexpensive manufacturing method (fourth functionality factor). For example, PMI's expert submits that Stanley's base with a constant diameter provides no utilitarian advantage over a base with a slight downward taper or a draft angle, and is allegedly more complicated and expensive to manufacture than other alternative designs.

With regard to the "hammertone finish," PMI's expert suggests that the durability benefits associated with using a hammertone finish have been matched by later developments in powder coating finishes and as a result, provides no more of a utilitarian advantage than other finishes. In addition, PMI contends that creating the hammertone finish costs more because it adds another step to the manufacturing process that is less economical than leaving the stainless steel finish inherent in the materials visible. Thermos' own employee charged with research and development of the "Work Series" bottle testified at his deposition that there are other matte and plastic finishes available, besides the hammertone finish, that are equally durable. Further, he testified that using the hammertone finish on the "Work Series" bottle increased the cost of production because it constituted an additional process. Thermos admits in its briefing that it used the hammertone finish in part to convey an image of "ruggedness," an arguably nonfunctional and aesthetic feature of product design. Def. Mot. for Summ. J., at 10. Taken together, PMI has offered sufficient evidence to suggest that the first and fourth factors in the functionality analysis exist.

To satisfy the second factor in the functionality analysis, PMI has submitted a number of alternative designs for vacuum-insulated bottles available to competitors such as Thermos. The Ninth Circuit has stated that the availability of other alternative designs "must be more than merely theoretical or speculative" and as a result, the court must find "that commercially feasible alternative configurations exist" in order to prevent hindering

ORDER – 8

competition. Disc Golf, 158 F.2d at 1008 (citations omitted). Based on photographs submitted by PMI's expert, it appears that Thermos manufactures a number of different types of vacuum bottles designed to insulate and store food and beverages. Further, the outside design company hired by Thermos to help it develop a competitor bottle proposed eight different designs to Thermos. Consequently, PMI has offered sufficient evidence to suggest that the second functionality factor – alternative designs – exists.

Although neither of the parties briefed whether PMI's advertising touts the utilitarian advantages of the design (the third factor in a functionality analysis), the court notes that a number of the advertisements submitted by PMI suggest that Aladdin Industries, Inc., the prior owner of the Stanley bottle, routinely highlighted the durability of the "tough all-steel thermos bottle . . . built to take a pounding year after year" in its advertising. McMinimee Decl., Exh. 8 (commercial depicting the Stanley bottle surviving a fall from a multi-story building under construction). Nevertheless, the court finds that PMI has submitted sufficient evidence on at least three of the four functionality factors to demonstrate that a material issue of fact exists regarding the functionality of Stanley's alleged trade dress as a whole.

### 2. Secondary Meaning

To establish a claim for trade dress infringement, PMI must also demonstrate that the alleged Stanley trade dress has obtained secondary meaning. Under Ninth Circuit jurisprudence, a product obtains secondary meaning "when the purchasing public associates the dress with a particular source," rather than the product itself. Clicks Billiards, 251 F.3d at 1262 (quoting Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.3d 837, 843 (9th Cir. 1987)); Samara Bros., 529 U.S. at 211. The court must consider three factors when assessing secondary meaning: (1) whether actual purchasers associate

ORDER – 9

PMI's alleged trade dress with its products[7], (2) the degree and manner of PMI's use of its alleged trade dress, and (3) whether PMI's use of its alleged trade dress has been exclusive. Vision Sports, 888 F.2d at 615. Determining whether a product has acquired secondary meaning is an issue of fact. Id., at 614; Clicks Billiards, 251 F.3d at 1262.

An expert survey of actual purchasers provides the "most persuasive" evidence of secondary meaning. Vision Sports, 888 F.2d at 615. Although such surveys are often subject to criticism and different interpretations, they are "routine and well-established" and the Ninth Circuit has held that they should be admitted if they are relevant and conducted according to accepted principles. Clicks Billiards, 251 F.3d at 1262-63. The Ninth Circuit has also held that "proof of copying strongly supports an inference of secondary meaning." Vision Sports, 888 F.2d at 615.

Here, PMI contends that it has satisfied the first factor, whether actual purchasers associate PMI's alleged trade dress with its products, by conducting a nationwide expert survey of adults who have used or purchased an insulated bottle. Over 60% of those who completed the survey identified the Stanley bottle as coming from a single source.[8] The

---

[7]The parties appear to dispute whether to satisfy this factor, PMI must demonstrate that actual purchasers associate the alleged Stanley trade dress with a single source regardless of its identity or, whether PMI must demonstrate that actual purchasers associate the Stanley bottle specifically with PMI or its predecessors in interest. Although Thermos devotes pages to arguing that consumer surveys prove that more people associate the Stanley bottle with Thermos rather than PMI, it recognizes that "secondary meaning does not require a particular source of origin." Def. Reply, at 5. Further, Ninth Circuit Model Civil Jury Instructions § 18.9 provides that an alleged trade dress has acquired secondary meaning when a significant number of prospective purchasers identify the product "with a single source, regardless of whether consumers know who or what that source is." Id. Consequently, the court will assume that the key inquiry for this factor is whether purchasers associate the alleged Stanley trade dress with a single source, regardless of its identity.

[8]The survey asked consumers to determine whether the "overall look, feel, and appearance" of the following products were associated with "one, or more than one company": a full Coca Cola bottle, empty Coca Cola bottle, Hummer, VW Beetle, tire, scissors, and Stanley bottle (in that order). McMinimee Decl., Exh. 35-B.

ORDER – 10

survey did not ask any follow-up questions directed at identifying the manufacturer, or source, of the Stanley bottle. Instead, the survey focused on what product design aspects contributed to the purchaser's view, i.e., the bottle's overall look and appearance, its handle, "crinkled looking finish," base, or other design features. Nearly 80% of those surveyed who identified the Stanley bottle with a single source, indicated that the bottle's overall look and appearance led to their conclusion. McMinimee Decl., Exh. 35.

Thermos strongly disputes the evidentiary value of PMI's expert survey and asks the court to disregard it. Thermos' major criticisms of the survey are that it failed to ask recipients about the source of the Stanley bottle, it failed to include any open-ended questions regarding why the recipients believed the Stanley bottle came from a single source, and the expert who designed it testified that he had never conducted such a survey before. Although Thermos' concerns about the value of PMI's expert survey may prove to be valid, the court cannot resolve these issues on summary judgment. Clicks Billiards, 251 F.3d at 1263 (concluding that "follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility" and are therefore issues for the jury or judge in a bench trial) (citation omitted); Summers v. A. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) ("The court must not weigh the evidence or determine the truth of the matters asserted but must only determine whether there is a genuine issue for trial.").

Thermos relies on another survey conducted by PMI, before it purchased the intellectual property rights to the Stanley bottle, to demonstrate that the Stanley bottle has not acquired secondary meaning. In this 2002 survey, nearly 60% of the respondents surveyed identified Thermos as the brand name that first came to mind when thinking about thermal bottle products. Thermos contends that these results demonstrate that the Stanley bottle has not obtained secondary meaning because the majority of respondents surveyed believe that all insulated bottles are manufactured by Thermos. Yet, the same

ORDER – 11

1 survey found that when respondents were shown a picture of the Stanley bottle, nearly
2 60% indicated that they had seen it before and of those, 20.7% believed that it was
3 manufactured by Stanley or Aladdin, while 21.1% believed it was manufactured by
4 Thermos.  Taken together, both surveys offer sufficient evidence to suggest that actual
5 purchasers associate Stanley's alleged trade dress with a single source.

6       To satisfy the second factor of the analysis – the degree and manner of PMI's use
7 of the alleged Stanley trade dress – PMI argues that it, along with its predecessors in
8 interest, has sold tens of millions of Stanley bottles over the decades bearing substantially
9 the same appearance.  When evaluating the "overall visual impression" created by Stanley
10 bottles allegedly dating from 1953, 1982, and 2003, the court notes that the bottles all
11 share similar features, including a stainless steel, "mirror" finish on the base and cup, a
12 green, "hammertone" finish on the bottle's body, and tapered shape from bottom to top.
13 PMI has offered sufficient evidence to suggest that the second factor exists.

14       PMI contends that the final "exclusivity" factor in the secondary meaning analysis
15 is evidenced by an absence in the record of any suggestion that another entity, besides
16 PMI and its predecessors, has continuously used all of the elements of the alleged Stanley
17 trade dress.  Given that Thermos has not offered any evidence to the contrary, the court
18 will infer that PMI and its predecessors have exclusively used the alleged trade dress.
19 Anderson, 477 U.S. at 255 (court must draw all reasonable inferences in favor of the
20 party opposing summary judgment).

21       PMI further argues that Thermos' alleged attempts to copy the Stanley bottle are
22 evidence that the Stanley trade dress has acquired secondary meaning.  The Ninth Circuit
23 has held that evidence of deliberate copying "strongly supports" an inference of
24 secondary meaning.  Vision Sports, 888 F.2d at 615; Clicks Billiards, 251 F.3d at 1264.
25 PMI has submitted substantial evidence that Thermos launched a concerted effort to
26 compete with the Stanley bottle in early 2001, called the "Stanley Attack" or "Stanley
27 Killer" plan.  McMinimee Decl., Exh. 11, 17-22 (deposition testimony, emails, memos).
28

ORDER – 12

1          Although Thermos allegedly had multiple potential designs to choose from when
2  designing its new Work Series bottle, including an alternative design equally liked by
3  focus groups, it allegedly chose the design that most resembled the Stanley bottle.
4  During the product design phase, one of Thermos' employees stated in an email that the
5  "Stanley attack bottle should be very similar to the Aladdin look (within the law)" and
6  "green in color – very similar to the Stanley bottle." Id., Exh. 20.  After Thermos
7  developed its new bottle, it indicated to senior management and sales representatives that
8  the "rationale" for choosing a hammertone paint finish for the bottle and mirror finish for
9  the base and cup, was to provide a "familiar visual link" to the Stanley bottle. Id., Exh.
10 30 ("Product Proposal Summary" for senior management) and 31 ("Product Launch
11 Packet" for sales representatives).  Thermos' Vice President of Sales during this period
12 admitted at his deposition that Thermos wanted to create a visual link to help the product
13 succeed.  Id., Exh. 15.

14         Thermos, on the other hand, disputes that it intended to copy the Stanley bottle and
15 argues instead that it went to "great pains" to produce a superior and visually distinct
16 product.  Mot. for Summ. J., at 11.  Thermos points to a number of differences between
17 its bottle and PMI's Stanley bottle, including a different bottle color, label, cup shape,
18 height, and handle attached by two black rubber bands circling the body of the bottle.
19 Additionally, Thermos points to an email from a PMI employee who, upon receiving the
20 new Thermos bottle, noted the design differences and actually suggested that Stanley
21 should incorporate Thermos' improved handle and foot pad "immediately."  O'Connor
22 Decl., Exh. 13.

23         Consistent with the Ninth Circuit's ruling in Clicks Billiards, the court finds that
24 the evidence of copying in this case is both "contested" and "controverted," and as a
25 result, precludes summary judgment.  251 F.3d at 1264 ("Even if we accept that
26 Sixshooters presented a version of events that cast considerable doubt on Clicks'
27 allegations of copying, it is not the role of the district court at this stage to decide which

ORDER – 13

1  party has the more compelling argument; rather, it is simply to determine whether a
2  triable issue of fact exists."). PMI has submitted sufficient evidence, in the form of
3  consumer surveys, Stanley bottles, and deposition testimony and documentary evidence
4  suggesting Thermos' intent to copy, to demonstrate that a material issue of fact exists
5  regarding whether the alleged Stanley trade dress has acquired secondary meaning.

### 3. Likelihood of Confusion

The final element that PMI must establish to receive trade dress protection – likelihood of confusion – is the "most important element" of the trade dress inquiry. Clicks Billiards, 251 F.3d at 1264-65 (quoting Kendall-Jackson Winery Ltd. v. E & J Gallo Winery, 150 F.3d 1042, 1048 (9th Cir. 1998)). Likelihood of confusion exists when customers viewing the alleged trade dress would probably assume that the product it represents is associated with the source of a different product identified by a similar mark. Id., 251 F.3d at 1265. Because this issue is so inherently factual, courts generally disfavor granting summary judgment on likelihood of confusion and routinely leave it for the jury to decide. Id.; KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 328 F.3d 1061, 1072 (9th Cir. 2003) (reasoning "a full record is usually required to fully assess the facts.").

The factual elements that create likelihood of confusion are (1) evidence of actual confusion, (2) the defendant's intent in adopting the alleged trade dress, (3) the similarity of marks, (4) the similarity of goods and marketing channels, and (5) the strength of the alleged trade dress. Clicks Billiards, 251 F.3d at 1265; KP Permanent, 328 F.3d at 1073 (listing substantially the same factors). Although each of the factors are appropriate for consideration in determining whether likelihood of confusion exists, not all of the factors are of equal importance or are applicable in every case. KP Permanent, 328 F.3d at 1073.

The first factor, evidence of actual confusion, is persuasive proof that likelihood of confusion exists, although it is not required. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1208 (9th Cir. 2000). Thermos argues that PMI's case fails on this issue

ORDER – 14

because it has not conducted a survey measuring consumers' confusion and therefore it cannot offer any evidence of actual confusion. Additionally, Thermos offers evidence from a likelihood of confusion survey it conducted allegedly demonstrating that no confusion exists. In response, PMI contends that it is not required to conduct such an expensive survey that could be disregarded or given little weight, and that Thermos' survey actually demonstrates that at least 12 out of the 404 respondents who looked at Thermos' bottle thought it was manufactured by Stanley. PMI further argues that Thermos' survey suffers from significant methodological flaws[9] and should be excluded at trial or given little weight.

At the summary judgment stage, the court will not resolve whether Thermos' survey should be excluded from or given little weight at trial. Further, as the party seeking trade dress protection, PMI bears the burden of establishing that actual confusion exists, not Thermos. The only evidence PMI has offered suggesting that actual confusion exists are the 12 Thermos survey respondents who mistakenly believed that Stanley manufactured the Thermos bottle – which amounts to less than one percent of the total number of respondents surveyed. Even if Thermos' survey is as flawed as PMI contends and the number of respondents actually confused is higher than one percent, PMI cannot rest on speculation alone and does not even attempt to project a more accurate percentage. Although PMI has failed to bring forth sufficient evidence to suggest that actual confusion exists, it is not required to bring forth such evidence to demonstrate that a material issue of fact exists regarding likelihood of confusion. GoTo.com, 202 F.3d at 1208; KP Permanent, 328 F.3d at 1073.

---

[9]PMI challenges a number of aspects of Thermos' survey, including the alleged: (1) failure to formulate a specific hypothesis, (2) poor, confusing, and leading questions, (3) failure to properly train and supervise interviewers, (4) failure to conduct a pre-test, (5) failure to conduct a proper mall intercept survey, (6) data editing and validation process without explanation, and (7) failure to weight data.

ORDER – 15

The second factor, the defendant's intent in adopting the alleged trade dress, is a critical factor entitled to "great weight" because a "defendant is presumed able to accomplish this purpose." E.g., Clicks Billiards, 251 F.3d at 1266 (quoting Fuddruckers, 826 F.2d at 845-46); First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1385 (9th Cir. 1987) ("intent of a defendant . . . alone may be sufficient to justify the inference that there is confusing similarity."). The court has previously found that Thermos' alleged intent to copy the Stanley trade dress is controverted and thereby precludes summary judgment on secondary meaning. Clicks Billiards, 251 F.3d at 1264. The same evidence brought forth by the parties regarding that issue is relevant here. Given that the court is required on summary judgment to draw all reasonable inferences in PMI's favor, the court must draw the inference from the evidence provided that Thermos intended to copy the alleged Stanley trade dress and afford it great weight. Id., at 1266 (reasoning that based on the evidence provided and summary judgment standard, "the court was required to draw the inference that Sixshooters did engage in copying.").

The similarity of Stanley's alleged trade dress and the Thermos bottle (the third factor) also supports a finding that a material issue of fact exists regarding likelihood of confusion. While considering the alleged similarity between the Stanley and Thermos bottles, the court must consider the bottles' visual appearance as they appear in the marketplace in their entirety, weighing similarities more heavily than differences. GoTo.com, 202 F.3d at 1206 (citations omitted). Viewing the bottles in their entirety, the court notes that the bottles share the following features: (1) a base substantially similar in diameter to the body, (2) a tapered shape from bottom to top, (3) a base and cup with matching stainless steel/mirror finishes, and (4) a body bearing a contrasting hammertone finish. At the same time, the court notes the bottles' differences: (1) body color, (2) cup length, (3) labels, and (4) black rubber bands attaching Thermos' handle. Thermos argues that the bottles' different labels, in particular, dispel consumers' likelihood of confusion. Yet, the court is unpersuaded by this argument because the labels are both

ORDER – 16

small, silver plates located in almost the same position on the bottle that can only be seen when the bottles are facing the same direction. Weighing the bottles' similarities more heavily, the court finds that the bottles are similar in their overall appearance.

The fourth factor in the analysis – the similarity of goods and marketing channels – also tends to support that a material issue of fact exists. In this case, the similarity of goods is indisputable. Both goods are steel, vacuum-insulated bottles used to store and transport hot and cold beverages. With regard to marketing channels, Thermos admits that both products are sold through the same channels of distribution and are "sold side by side" in stores such as Target. Def. Mot. for Summ. J., at 17. PMI has submitted photographs evidencing this same point.

Finally, the fifth factor, the strength of PMI's alleged trade dress, also suggests that a material issue of fact exists. PMI has submitted Stanley bottles allegedly dating from 1953, 1982, and 2003, all sharing similar features, including a stainless steel finish on the base and cup, a green hammertone finish on the bottle's body, and tapered shape from bottom to top. The Stanley bottle's strength is further demonstrated by its alleged appearance in popular media, including the movie <u>Office Space</u>, magazines <u>American Style</u>, <u>Forbes</u>, and <u>Town and Country</u>, and print advertisements for the Toyota Tundra4. Thermos' own employee involved with developing the competing Work Series bottle admitted at his deposition that the design of the Stanley bottle has established a strong heritage and brand presence in the market. Thus, the court finds that PMI has submitted sufficient evidence on four out of the five factors for the court to conclude that a material issue of fact exists regarding whether Thermos' bottle creates a likelihood of confusion.

ORDER – 17

## IV.   CONCLUSION

For the reasons stated above, the court DENIES Thermos' motion for summary judgment (Dkt. # 37).

Dated this 30th day of November, 2004.

s/James L. Robart
_____
JAMES L. ROBART
United States District Court Judge

ORDER – 18