THE HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PACIFIC MARKET, INC., a Washington corporation, and PACIFIC MARKET INTERNATIONAL, L.L.C., a Washington limited liability company, collectively d/b/a PACIFIC MARKET INTERNATIONAL, <br><br> Plaintiffs, <br><br> vs. <br><br> THERMOS L.L.C., a Delaware limited liability company, <br><br> Defendant. | CIVIL ACTION NO.  CV03-1261 JLR <br><br> **PLAINTIFFS' TRIAL BRIEF** |

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................1

II.     BRIEF STATEMENT OF MATERIAL FACTS .......................................2

A.      The Parties and the Products at Issue ........................................................2
        1.      PMI and the Stanley Bottle ..............................................................2
        2.      Thermos and the "Stanley Killer" Bottle ......................................3
B.      Impact of the Stanley Killer Bottles and This Lawsuit ............................4

III.    LEGAL ISSUES ...............................................................................................5

A.      The Elements of PMI's Lanham Act and Common Law Infringement Claims .................5
        1.      The Stanley Trade Dress ...................................................................7
        2.      Functionality ......................................................................................7
        3.      Secondary Meaning .........................................................................9
                a.      The "Single Source" Standard ................................................9
                b.      Factors to Consider in Determining Secondary Meaning......9
        4.      Likelihood of Confusion .................................................................10
                a.      The Strength of the Mark .......................................................11
                b.      The Proximity of the Goods....................................................11
                c.      The Similarity of the Marks ...................................................11
                d.      Evidence of Actual Confusion................................................13
                e.      The Degree to Which the Marketing Channels Converge ...................14
                f.      The Type of Good and Degree of Care Exercised by Consumers ............................................................................14
                g.      Intent in Selecting the Infringing Mark ................................14
                h.      Likelihood of Expansion........................................................15
B.      The Elements of PMI's Washington Consumer Protection Act Claim ...........................15
        1.      Establishing that an Act or Practice is Unfair or Deceptive ...........16
        2.      Establishing that an Act or Practice Occurred in the Conduct of Trade or Commerce .........................................................................16
        3.      Establishing a Sufficient Showing of Public Interest ......................16
        4.      Establishing an Injury to Business or Property.................................17
        5.      Establishing a Causal Link Between the Unfair Acts and the Injury Suffered .........................................................................................17

IV.     THE ELEMENTS OF THERMOS'S LACHES DEFENSE ........................17

V.      RELIEF AVAILABLE TO PMI ...................................................................19

A.      Injunctive Relief.........................................................................................19
B.      Monetary Recovery.....................................................................................19
        1.      Monetary Recovery Under The Lanman Act....................................19
                a.      Disgorgement of Profits..........................................................19
                b.      Actual Damages ......................................................................20
                c.      Costs and Fees.........................................................................21
        2.      Monetary Recovery Under The Washington Consumer Protection Act .............21

VI.     DISPUTED JURY INSTRUCTIONS ............................................................21

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

I.      **INTRODUCTION**

In 1913, William Stanley invented the first "Stanley" bottle.  Tens of millions of Stanley bottles have been sold since then.  The appearance of the Stanley bottle has been remarkably consistent through the years, particularly the "torpedo" like shape, the matching, glossy metallic-looking cup and base, and, since 1953, the "crinkled" or "hammertone" paint finish.  The Stanley bottle has become an "icon" in American product design.  The familiar Stanley bottle is preferred over other brands by construction workers, tradesmen, outdoor enthusiasts, and other people who need a durable steel bottle for storing hot and cold beverages.

For many years, defendant Thermos L.L.C. ("Thermos") has been the dominant manufacturer of insulated bottles in certain segments of the market, such as students, office workers and kids.  But Thermos had been largely unable to crack the "blue collar" market. Thermos developed a bottle called "The Rock" to compete with the Stanley bottle, but it failed to quickly displace Stanley on store shelves as Thermos had hoped.  So, in 2001, Thermos initiated a secret project to "kill" the Stanley bottle, even naming its plan the "Stanley Killer" project. Thermos engaged outside designers who suggested a variety of design options.  In the end, however, Thermos simply copied the most recognizable features of the Stanley bottle:  its torpedo-like shape, matching metallic-looking cup and base, and hammertone paint finish. Thermos even made the size of its package the same as the Stanley package, so it could easily replace the Stanley bottle on store shelves.  Internally, Thermos dubbed its knock-off the "Stanley Killer" bottle.

In early 2002, before Thermos's copycat bottle was known to the public, Pacific Market, Inc., and Pacific Market International, L.L.C., who together do business as Pacific Market International ("PMI"), acquired the rights to the Stanley bottle from Aladdin Industries L.L.C. ("Aladdin").  PMI paid millions of dollars for the intellectual property rights to the Stanley bottle, including its iconic trade dress.  PMI moved the manufacturing of the bottle overseas, and

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

changed the type of steel used to make the bottle, but carefully maintained the well-recognized shape and external appearance of the Stanley bottle.  PMI commenced this action after Thermos refused to modify its "Stanley Killer" bottle to stop infringing the trade dress rights of the Stanley bottle.  PMI is seeking an injunction barring Thermos from selling its infringing "Stanley Killer" bottle.  PMI is also seeking an award of monetary relief based upon the profits Thermos has earned from its infringing product; or, alternatively, based upon its own actual damages.

## II.   BRIEF STATEMENT OF MATERIAL FACTS

### A.   The Parties and the Products at Issue

#### 1.   PMI and the Stanley Bottle

PMI is a Seattle-based design and manufacturing company.  In 2002, PMI paid more than $6 million to acquire from Aladdin certain assets, including the intellectual property rights to the Stanley and Aladdin product lines.  PMI made this purchase primarily to acquire the rights to the Stanley bottle.  Aladdin had purchased the rights to the Stanley bottle in the late 1960s from Landers, Frary, and Clark, who had acquired William Stanley's original Stanley Vacuum Insulating Company in the early 1920s.

Thermos claims PMI did not purchase the trade dress of the Stanley bottle or the goodwill associated with it from Aladdin.  This contention is wrong.  PMI purchased all of the "intellectual property" rights related to the Stanley bottle from Aladdin.  Aladdin's Chairman confirmed this in Aladdin's 30(b)(6) deposition.  But, to clear up any doubts as to the meaning of "intellectual property" as the phrase was used in the purchase agreement, Aladdin and PMI later confirmed that the "intellectual property" purchased by PMI in February of 2002 included:

> …trademarks, trade names, trade dress, logos, business and product names, slogans, and all other source identifiers, including all unregistered rights, common law rights, statutory rights, applications, and registrations together with the goodwill of the business associated therewith; … [and] intellectual property rights deriving from or related to any of the foregoing …. [Stanley and Aladdin product lines].

PLAINTIFFS' TRIAL BRIEF-2-
CV03-1261C JLR

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1    After acquiring the rights to the Stanley bottle, PMI updated the inner workings of the
2    bottle and substituted stainless steel for the cold-rolled steel that had been used to form the
3    bottle, but deliberately made no changes to the external appearance of the product.  PMI also
4    spent a significant amount of money on a 90th Anniversary campaign to further promote the
5    Stanley bottle, something that Aladdin had not been able to afford to do for some time.

6    **2.     Thermos and the "Stanley Killer" Bottle**

7    Thermos is the dominant manufacturer of insulated bottles in certain segments of the
8    market, but Thermos has long recognized the Stanley bottle to be the dominant product in the
9    blue collar/trade worker segment of the market.  In 1996, Thermos hired a research firm called
10   Meridian and Associates, Inc. ("Meridian") to help "define the Stanley mystique among blue
11   collar workers."  The research informed Thermos that the appearance of the Stanley bottle is one
12   of the factors causing its success in the blue collar market segment.  In the late 1990s, Thermos
13   developed a bottle called "The Rock" to compete for the blue collar market dominated by
14   Stanley.  The Rock was intended to be functionally equivalent to the Stanley bottle, but with its
15   own unique design.  Although the Rock sold fairly well, it did not achieve Thermos's ultimate
16   goal of eliminating the Stanley bottle from the marketplace.

17   Having failed to develop a product that would quickly "eliminate" the Stanley bottle from
18   retailers' shelves, and after learning that Aladdin was facing financial difficulties, Thermos
19   executives developed the "Stanley Killer" plan in early 2001 to produce a bottle that copied the
20   essential visual characteristics of the Stanley bottle.  The result of this project was the "Stanley
21   Killer" bottle, ultimately marketed as the Thermos Work Series Beverage Bottle.  Thermos hired
22   Joss Design Group ("Joss") to assist in developing the "Stanley Killer" bottle.  Joss proposed
23   numerous different designs it believed could effectively compete with the Stanley bottle.
24   Thermos narrowed its choices to three designs, and submitted them to "focus group" testing
25   conducted by The Landan Group ("Landan").  Thermos instructed Landan to survey only Stanley

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

bottle owners to find out what appealed to them.  The research showed that Thermos had several viable, non-infringing alternatives for competing with the Stanley bottle for the blue collar market segment.  Although focus groups also equally liked alternative designs, Thermos chose the design that most resembled the Stanley bottle for its "Stanley Killer" product.

Ultimately, Thermos chose to use a matching glossy metallic finish on the cup and on the base of its "Stanley Killer" bottle because those are features preferred by Stanley bottle users.  Thermos decided that "Stanley Killer" bottles should have a shape and size that was "very close" to the Stanley bottle.  Thermos selected a hammertone finish that precisely matches the finish used on Stanley bottles, although Thermos had used a very different hammertone texture in the past.  The motivation for these design choices was Thermos's calculated intent to *copy* the popular visual features of the Stanley bottle, not concerns related to utility, cost, or performance.

**B.**     **Impact of the Stanley Killer Bottles and This Lawsuit**

In the fall of 2002, just as sales were starting to improve for the Stanley bottle as a result of PMI's renewed marketing and promotion efforts, Thermos introduced its Stanley Killer product in Target stores.  Even though it was a new product, Thermos advertised the Work Series bottle as a "proven performer."  PMI suffered a dramatic decrease in the sales of Stanley bottles at Target after the introduction of the Work Series bottle.

PMI was surprised to learn that Thermos had copied the trade dress of the Stanley bottle.  Robert Harris, PMI's founder and Chief Executive Officer, approached Thermos's then-President T.H. Chang, in hopes that the issue could be resolved without litigation.  Mr. Harris asked Mr. Chang why Thermos had elected to copy the Stanley bottle, and requested that Thermos revise the Work Series bottle to avoid infringing upon the Stanley bottle's trade dress.  Mr. Harris's requests were ignored.  Because Thermos rebuffed PMI's attempts to resolve the matter short of litigation, PMI was forced to file this suit against Thermos for violation of § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); Washington's common law against unfair

**Dorsey & Whitney llp**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

competition; and the Washington Consumer Protection Act (Wash. Rev. Code §19.86.020 *et seq.*).

### III.   LEGAL ISSUES

#### A.   The Elements of PMI's Lanham Act and Common Law Infringement Claims

This Court previously ruled on summary judgment:

> PMI's trade dress infringement claim arises under section 43(a) of the Lanham Act which provides a cause of action against any person who uses a symbol or device that is likely to cause confusion as to the origin of the goods.   15 U.S.C. §1125(a).   Although not explicit in the text, this provision protects "trade dress," a category that includes the packaging and design of a product.   *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000).   The Ninth Circuit has defined trade dress as the "total image, design, and appearance of a product."   *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).   It can include features such as "size, shape, color, color combinations, texture or graphics."   *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993) (internal quotation marks and citations omitted).   While evaluating a trade dress claim, the court must focus on the "overall visual impression" created by the alleged trade dress and not focus on the "individual constituent parts."   *Clicks Billiards*, 251 F.3d at 1259.

*Dkt. No. 72*, at 4-5.

A product design configuration trade dress is legally protectable under the Lanham Act when (1) it is non-functional; (2) it serves a source-identifying role because it has acquired secondary meaning;[1] and (3) the use of its elements by another is likely to create consumer confusion as to the source of the related good.   15 U.S.C. § 1125(a), § 43(a) of the Lanham Act; *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205 (2000); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001).   A claim for violation of Washington's common law against unfair competition is comprised of the same elements.   *Cedar-Al Products, Inc. v. Chamberlain*, 687 P.2d 880, 881-82 (Wash. App. 1984).

---

[1]   In a product packaging trade dress case, the trade dress may also be subject to protection if it is inherently distinctive.   *See Clicks Billiards*, 251 F.3d at 1258.   However, in *Wal-Mart*, the U.S. Supreme Court held that for product design configuration trade dress cases, a product's design "is distinctive, and therefore protectable, only upon a showing of secondary meaning."   529 U.S. at 216.

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

Thermos incorrectly insists that there is an additional, "non-genericness" requirement which PMI must also prove. The concept of "non-genericness" specifically relates to the consideration of the distinctiveness of a word mark on the so-called *Abercrombie* spectrum. *See Abercrombie & Fitch Co. v. Hunting World Inc.*, 537 F.2d 4 (2d Cir. 1976). But in *Wal-Mart*, the U.S. Supreme Court concluded that there are no inherently distinctive product design configurations. 529 U.S. at 212. The Court held that a product design configuration trade dress must acquire secondary meaning to be protectable. *Id.* at 216. In listing the required elements for a product design configuration trade dress claim, the Supreme Court specifically did not include a non-genericness requirement. *Id.* at 210, 216. This omission was not an oversight, it was an intentional rejection of a non-genericness requirement in product design configuration cases. *Id.* at 210-11 (stating that the *Abercrombie* test applies "in the context of word marks" and favorably citing *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1008 (2d Cir. 1995), which rejected non-genericness as an element of a product configuration case); 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:13 (4th ed. 2004) ("The *Abercrombie* spectrum was developed specifically for word marks, and does not translate into the world of shapes and designs.").

Requiring PMI to prove non-genericness as a separate element of its product design configuration trade dress infringement claim would be inconsistent with the terms of Section 43(a) of Lanham Act, the U.S. Supreme Court's decision in *Wal-Mart*, and Ninth Circuit jurisprudence. *Wal-Mart*, 529 U.S. at 216; *Clicks Billiards*, 251 F.3d at 1257-58; *Disc Golf Ass'n v. Champion Discs, Inc.,* 158 F.3d 1002, 1005 (9th Cir. 1998). PMI need only prove that: it owns the rights to the Stanley bottle's trade dress; the Stanley bottle's trade dress is nonfunctional; the Stanley bottle's trade dress is distinctive because it has acquired secondary meaning; Thermos has used design elements similar to the Stanley bottle's trade dress without the consent of PMI in a manner that is likely to cause confusion among ordinary purchasers as to

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

the source of the goods or whether there was an affiliation between the products or their producers; and PMI was damaged by Thermos's infringement.  *Ninth Circuit Model Civil Jury Instruction 18.5A.*

### 1.      The Stanley Trade Dress

PMI will show that the overall look and feel of the Stanley bottle constitutes its trade dress.  It includes some or all of the following elements (the "Stanley Trade Dress"):

a.      a base of constant diameter substantially throughout its length;

b.      a tapered or torpedo like overall look and appearance from bottom to top generated from the top or cap being a diameter that is less than the body;

c.      a body bearing a crinkled finish with a solid color;

d.      a top or cap and band at the base of the body bearing the appearance of a stainless steel finish; and

e.      a band at the base of the top or cap with a color that substantially matches the color of the body.

Features a, b, c, and d have been a part of the design of the Stanley bottle since at least 1953, and feature "e" has been a part of the design of the Stanley bottle since at least 1968.

### 2.      Functionality

A trade dress cannot be legally protected if it is functional.  *Clicks Billiards*, 251 F.3d at 1258.  Functionality is a question of fact to be determined by the jury.  *Disc Golf Ass'n*, 158 F.3d at 1006.  The starting point in determining whether a trade dress is functional is the standard given by the U.S. Supreme Court in *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995) (internal quotations omitted):

> In general terms, a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.

The Ninth has determined that the following factors can be considered in a functionality analysis:

(1)      whether the design yields a utilitarian advantage;
(2)      whether alternative designs are available;
(3)      whether advertising touts the utilitarian advantages of the design; and
(4)      whether the particular design results from a comparatively simple or inexpensive method of manufacture.

PLAINTIFFS' TRIAL BRIEF-7-
CV03-1261C JLR

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1    *Clicks Billiards*, 251 F.3d at 1260 (9th Cir. 2001), *citing, Disc Golf Ass'n,* 158 F.3d at 1006.

2    Additionally, "[t]he fact that individual elements of [a] trade dress may be functional does not

3    necessarily mean that the trade dress *as a whole* is functional; rather, functional elements that are

4    separately unprotectable can be protected together as part of a trade dress."   *Id.* at 1259

5    (emphasis in original, internal quotations omitted).

6         Thermos compares this case to litigation in which the either a product's entire trade dress,

7    or every element of its trade dress, was the essential <u>use</u> or <u>purpose</u> of the product.   *See TrafFix*

8    *Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 33 (2001) (ruling that the dual spring

9    design on traffic signs was functional because the springs themselves were "the reason the device

10   works"); *Talking Rain Beverage Co. Inc. v. South Beach Beverage Co*. 349 F.3d 601, 604-05

11   (9th Cir. 2003) (concluding the claimed trade dress, the particular shape of a bottle, was

12   functional because the entire purpose of the bottle was to be an easy-to-hold container);

13   *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999)

14   (ruling that the arrangement of a multi-function pocket tool could not be protected, as each

15   element of the claimed trade dress, the individual items within the tool, were essential to the

16   purpose of a multi-function pocket tool, and the particular assemblage of the items was

17   functional because it resulted in superior performance).

18        Such comparisons are not appropriate here.  The essential use and purpose of the Stanley

19   bottle is to store hot or cold beverages.  Neither the Stanley Trade Dress as a whole, nor any of

20   its individual elements, play a role in meeting this purpose.  This is not a case like *TrafFix*,

21   *Talking Rain*, or *Leatherman*, where the product had a particular design because it worked better

22   in that design.  In *Leatherman*, the Ninth Circuit explained that the design of every product is *de*

23   *facto functional*, because every product has some sort of use: "i.e., a bottle of any design holds

24   fluid." 199 F.3d at 1012 (internal quotations omitted).  The court explained that *de facto*

25   *functionality* does not preclude trade dress protection.  *Id.*  It is *de jure functional* designs,

PLAINTIFFS' TRIAL BRIEF-8-
CV03-1261C JLR

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

designs where "the product is in its particular shape because it works better in this shape," which cannot be given trade dress protection. *Id.* (internal quotations omitted). Here, the Stanley Trade Dress has no *de jure functionality*; nothing about the Stanley Trade Dress helps the bottle better regulate the temperature of the fluid it contains.

### 3. Secondary Meaning

#### a. The "Single Source" Standard

As this Court has previously concluded, the correct standard for determining whether trade dress has acquired secondary meaning is whether the purchasing public associates the product as having come from a single source or producer, even if the identity of that source is unknown. *See Lisa Frank, Inc. v. Impact Int'l, Inc.,* 799 F. Supp. 980, 989 (D. Az. 1992) (emphasis added); *Ninth Circuit Model Civil Jury Instruction 18.9* ("A [word] [symbol] [term] acquires a secondary meaning when it has been used in such a way that its primary significance in the minds of the prospective purchasers is not the product itself, but the identification of the product with a single source, regardless of whether consumers know who or what that source is.").

Before the Court granted PMI's Motion in Limine No. 1 and confirmed that the Ninth Circuit standard of secondary meaning is the standard set forth in *Ninth Circuit Model Civil Jury Instruction 18.9*, Thermos persisted in arguing that PMI had to prove that products with the Stanley Trade Dress came both from a "single" source and from the "same" source. This was a distinction invented by Thermos, wholly unsupported by reference to Ninth Circuit law. PMI is not required to prove that consumers believe the Stanley trade dress comes from a "single" source *and also* from the "same" source. This new Thermos-created standard was redundant, confusing, and unsupported by law. *See Ninth Circuit Model Civil Jury Instruction 18.9.*

#### b. Factors to Consider in Determining Secondary Meaning

In the Ninth Circuit, the determination of secondary meaning is also a question of fact.

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

*Clicks Billiards*, 251 F.3d at 1262.  The Ninth Circuit has held that the following factors can be considered in determining if a product configuration has acquired secondary meaning:

(1)     whether actual purchasers associate plaintiff's trade dress with its products;
(2)     the degree and manner of plaintiff's use of the trade dress; and
(3)     whether the plaintiff's use of the trade dress has been exclusive.

*Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989).  The existence of secondary meaning can be proved in different ways.  "Evidence of use and advertising over a substantial period of time is enough to establish secondary meaning."  *Clamp Mfg. Co., Inc. v. Enco Mfg. Co., Inc.*, 870 F.2d 512, 517 (9th Cir. 1989).  Further, proof of copying "strongly supports an inference of secondary meaning."  *Vision Sports*, 888 F.2d at 615.

### 4.     Likelihood of Confusion

As this Court has previously stated, "[t]he final element that PMI must establish to receive trade dress protection - likelihood of confusion - is the 'most important element' of the trade dress inquiry."  *Dkt. No. 72*, at 13.  Likelihood of confusion exists when consumers viewing a mark are likely to assume that the product it represents is associated with the source of a different product identified by a similar mark.  *Clicks Billiards*, 251 F.3d at 1265.  Likelihood of confusion can also be established if consumers are likely to conclude that there is some relationship or association between the two products or their producers.  *See Mattel, Inc. v. Walking Mountain Prod.*, 353 F.3d 792, 806-07 (9th Cir. 2003).  Like functionality and secondary meaning, likelihood of confusion is a question of fact.  *Clicks Billiards*, 251 F.3d at 1264-65.

The Ninth Circuit has suggested eight factors that may be considered in determining a likelihood of confusion:

(1)     the strength of the mark,
(2)     the proximity of the goods,
(3)     the similarity of the marks,
(4)     any evidence of actual confusion,
(5)     the degree to which the marketing channels converge,
(6)     the types of goods and degree of care exercised by consumers,
(7)     the intent of defendant in selecting the infringing mark, and
(8)     the likelihood that the parties will expand their product lines.

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1   *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-50 (9th Cir. 1979); *Brookfield Communications,*
2   *Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1053-54 (9th Cir. 1999).  PMI is <u>not</u> required to
3   offer evidence concerning <u>all</u> factors in order to establish a likelihood of confusion.  *See*
4   *Brookfield*, 174 F.3d 1054.

### a.    The Strength of the Mark

6   The stronger the mark at issue, the more likely that consumers will be confused by the
7   use of a similar mark by another.  *See Sleekcraft*, 599 F.2d at 349.  A mark that has acquired
8   secondary meaning is considered to be a strong mark.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*,
9   505 U.S. 763, 770 (1992).  The Stanley Trade Dress has acquired secondary meaning, and is thus
10  a strong mark.

### b.    The Proximity of the Goods

12  "Related goods are generally more likely than unrelated goods to confuse the public as to
13  the producer of the goods."  *Brookfield*, 174 F.3d at 1055.  The danger is that the public will
14  "mistakenly assume there is an association between the producers of the related goods, though
15  no such association exits."  *Sleekcraft*, 599 F.2d at 350.  In this case, there is no dispute that the
16  two goods are identical in proximity.   Thermos, through its deposition testimony and its
17  Responses to Requests for Admission, has acknowledged that both are steel, vacuum-insulated
18  beverage bottles, targeted to the same market.

### c.    The Similarity of the Marks

20  "[T]he similarity of the marks has always been considered a critical question in the
21  likelihood of confusion analysis ..... Obviously, the greater the similarity between the two marks
22  at issue, the greater the likelihood of confusion."  *Goto.com Inc. v. Walt Disney Co.*, 202 F.3d
23  1199, 1206 (9th Cir. 2000).  When considering the similarity of the Stanley Trade Dress and the
24  visual appearance of the Work Series bottle, similarities are weighted more heavily than
25  differences.  *Id.* at 1206.  Here, the visual appearance of the Work Series bottle is extremely

PLAINTIFFS' TRIAL BRIEF-11-
CV03-1261C JLR

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

similar to the Stanley Trade Dress.

Thermos has asserted that as a matter of law, the appearance of its trademark and its packaging negate any likelihood of confusion. However, such arguments are not affirmative defenses in an infringement case, they instead are merely things to take into account when considering the similarity of the marks.

> (i)    **The appearance of the Thermos trademark on the Work Series bottle does not, as a matter of law, negate the possibility of confusion.**

Thermos argues in its portion of the Amended Pretrial Order and its proposed alternative jury instruction language that as a matter of law, the presence of its trademark on the Work Series bottle and packaging negates any possibility of confusion. As articulated in great length in PMI's Opposition to Thermos's Motion for Summary Judgment, the addition of a label, even one that includes a trademark, does not negate the possibility of confusion. *See Dkt. No. 57* at 22-23. Further, the addition of the Thermos trademark does little to distinguish the products, as the word "thermos" is a generic term for this type of product. *See Am. Thermos Prod. Co. v. Aladdin Indus., Inc.,* 207 F. Supp. 9 (D. Conn. 1962) (holding that the term 'thermos' is generic and is in the public domain), *aff'd by King-Seeley Thermos Co. v. Aladdin Indust., Inc.*, 321 F.2d 577 (2d Cir. 1963). The presence of the Thermos mark does not, as a matter of law, clearly distinguish its bottle as being manufactured by a company named "Thermos." *See Fun-Damental Too., Ltd. v. Gemmy Indust. Corp.* 111 F.3d 993, 1000-03 (2d Cir. 1997) (ruling that when a label is a generic or non-distinctive term, it does little to overcome potential confusion based on a similar trade dress); *Nabisco Brands, Inc. v. Consuma Corp.* 722 F. Supp. 1287, 1291 (M.D. N.C. 1989) (ruling that even though candies displayed different names, "such a small difference does not argue against similarity").

> (ii)   **Thermos's packaging does not, as a matter of law, negate the possibility of confusion**

PLAINTIFFS' TRIAL BRIEF-12-
CV03-1261C JLR

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

Thermos's contention that as a matter of law, its packaging negates any likelihood of confusion is yet another misrepresentation of the law.  The Ninth Circuit has concluded that confusion on the part of someone *other than* the purchaser, who later sees the product outside of its packaging, is sufficient to establish a likelihood of confusion.  *Karl Storz Endoscopy-America, Inc. v. Surgical Tech.*, *Inc.*, 285 F.3d 848, 854 (9th Cir. 2002).  "Post-sale confusion occurs 'when consumers view a product outside the context in which it is originally distributed and confuse it with another, similar product.'" *Adidas-Salomon AG v. Target Corp*., 228 F.Supp.2d 1192, 1212 (D. Or. 2002) (quoting *Academy of Motion Picture Arts and Sciences v. Creative House*, 944 F.2d 1446, 1455 (9th Cir.1991)).

**d.       Evidence of Actual Confusion**

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352.  Courts recognize that "reliable evidence of actual confusion is difficult to obtain in trademark and unfair competition cases," therefore, "any such evidence is substantial evidence of likelihood of confusion." *Checkpoint Systems, Inc. v. Check Point Software Tech., Inc*., 269 F.3d 270, 291 (3rd Cir. 2001); *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 686 (7th Cir. 2001) ("One instance of actual confusion has been deemed sufficient to weigh in favor of finding a likelihood of confusion.") (citation omitted).  However, evidence of actual confusion is <u>not</u> required to establish a likelihood of confusion. *GoTo.com, Inc.,* 202 F.3d at 1208; *Ninth Circuit Model Jury Instruction 18.15* ("Even if actual confusion did not occur, the defendant's use of the trademark may still be likely to cause confusion.").  Further, "the Ninth Circuit has explicitly recognized that the use of another's trademark in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may still be an infringement.'" *Adidas-Salomon*, 228 F.Supp.2d at 1212 (quoting *Dr. Seuss Enter., LP v. Penguin Books USA, Inc*., 109 F.3d 1394, 1405 (9th Cir.1997)).

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1   Thermos's primary defense on the issue of likelihood of confusion is a survey conducted

2   by Phillip Johnson.  Thermos's survey is full of defects.  Despite this stacked deck, Mr. Johnson

3   was unable to avoid finding individuals who were actually confused: people who believed the

4   Work Series bottle was a Stanley bottle, or was in some way affiliated with the same company

5   that made the Stanley bottle.  Thermos attempted to prevent the jury from hearing this evidence;

6   however, the Court denied Thermos's Motion in Limine, ruling that this evidence of confusion

7   can be considered by the jury.

8           **e.**        **The Degree to Which the Marketing Channels Converge**

9   If the marketing channels of the two products converge, there is a greater likelihood of

10  confusion.  *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987);

11  *Sleekcraft*, 599 F.2d at 353.  The markets here are identical.  These competing product lines are

12  both sold to retailers, and are often sold side-by-side on store shelves.

13          **f.**        **The Type of Good and Degree of Care Exercised by Consumers**

14  In determining likelihood of confusion, courts consider who the "typical buyer" of the

15  product is, and the level of care that a typical buyer would use in purchasing the product.

16  *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 156 (9th Cir. 1963).  The

17  lower the degree of care, the higher the likelihood of confusion.  *Brookfield*, 174 F.3d at 1060

18  ("when dealing with inexpensive products, customers are likely to exercise less care, thus

19  making confusion more likely").  Former Thermos executives have testified that consumers use

20  very little care in purchasing these types of goods.

21          **g.**        **Intent in Selecting the Infringing Mark**

22  "A showing that the defendant intended to adopt the plaintiff's trade dress is entitled to

23  great weight because a defendant is presumed able to accomplish this purpose."  *Click Billiards*,

24  251 F.3d at 1266 (citing *Fuddruckers Inc., v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 854 (9th

25  Cir. 1987).  "[I]ntent of a defendant . . . alone may be sufficient to justify the inference that there

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

is confusing similarity." *First Brands Corp.  v. Fred Meyer, Inc*., 809 F.2d 1378, 1385 (9th Cir. 1987); *see also* "*Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 973-74 (10th Cir. 2002) ("Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion."). "[W]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992).   Here, Thermos intentionally elected to use elements of the Stanley Trade Dress in the Work Series bottle.  Consequently, this factor alone supports a finding of likelihood of confusion in this case.

### h.      Likelihood of Expansion

The eighth *Sleekcraft* factor is not relevant in this case, as the two parties already directly compete.  *Brookfield,* 174 F.3d at 1060 ("The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent.").

## B.      The Elements of PMI's Washington Consumer Protection Act Claim

Under the Washington Consumer Protection Act ("CPA"), "[u]nfair methods of competition and unfair or deceptive acts . . . in the conduct of any trade or commerce" are unlawful.   Wash. Rev. Code § 19.86.020.   Courts have determined that "unfair methods of competition" under the CPA embraces a much larger category of acts than a common law unfair competition claim.  *See Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc*., 504 P.2d 1139, 1141 (Wash. 1973).  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531 (Wash. 1986) sets forth the requirements for such an action:

(1)     An unfair or deceptive act or practice;
(2)     Which occurred in the conduct of trade or commerce;
(3)     Where there is a sufficient showing of public interest;
(4)     Where the plaintiff's business or property has been injured; and
(5)     Where a causal link exists between the unfair acts and injury suffered.

*Hangman Ridge*, 719 P.2d at 535-39, *Nordstrom, Inc. v. Tampourlos*, 733 P.2d 208, 210 (Wash.

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1987) (applying the *Hangman Ridge* factors to the deceptive use of another's trade name).

### 1. Establishing that an Act or Practice is Unfair or Deceptive

In order to prove that a defendant has engaged in an unfair or deceptive act or practice, PMI must show that Thermos's distribution and sale of the Work Series bottle has the capacity to deceive a substantial portion of the public. *Nordstrom*, 733 P.2d at 210. PMI does not have to show that the Thermos actually intended to deceive the public. *State v. A.N.W. Seed Corp*. 802 P.2d 1353, 1359 (Wash. 1991); *Hangman Ridge*, 719 P.2d at 535. In *Nordstrom*, the court ruled that the use of the name "Nostrum" and a symbol similar to the one that used by the retailer Nordstrom, was an unfair and deceptive act because it "tends to and does deceive or mislead persons of ordinary caution into the belief that they are dealing with one concern when in fact they are dealing with the other." 733 P.2d at 210.

### 2. Establishing that an Act or Practice Occurred in the Conduct of Trade or Commerce

The phrase "trade or commerce" has been interpreted very broadly by the courts, and any conduct which involves the sale of goods or services of any value, which directly or indirectly effects Washington residents will "occur in the conduct of trade or commerce." Wash. Rev. Code §§ 19.86.010(2), 19.86.010(3), *Hangman Ridge*, 719 P.2d at 535. Here, Thermos acknowledges that it sells the Work Series bottle in Washington.

### 3. Establishing a Sufficient Showing of Public Interest

In *Nordstrom*, the court stated that a plaintiff who successfully establishes trademark infringement also makes a sufficient showing of public interest for a CPA action, because the potential for causing public confusion is required to prove infringement. *Id*. In *Seattle Endeavors, Inc. v. Mastro*, 868 P.2d 120, 127 (Wash. 1994), the court clarified that an inadvertent infringement of a weak mark would not establish a sufficient showing of public interest for a CPA action. Here, Thermos has intentionally infringed on the Stanley Trade Dress, a strong mark.

PLAINTIFFS' TRIAL BRIEF-16-
CV03-1261C JLR

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

### 4.    Establishing an Injury to Business or Property

To meet this element, a plaintiff needs to show that its business or property has suffered some injury.  Wash. Rev. Code § 19.86.090.  The injury does not need to be great or even monetarily quantifiable.  *Hangman Ridge*, 719 P.2d at 535, *Mason v. Mortgage Am. Inc.*, 792 P.2d 142 (Wash. 1990) (delay can qualify as an injury to business or property).  In *Nordstrom*, the court ruled that the defendant's infringement on the Nordstrom name was sufficient injury to its business or property, as it affected Nordstrom's business reputation.  733 P.2d at 211.

### 5.    Establishing a Causal Link Between the Unfair Acts and the Injury Suffered

The unfair or deceptive act must actually and proximately cause the injury suffered by the plaintiff.  *Hangman Ridge*, 719 P.2d at 535, 540.  In *Nordstrom*, the court concluded that there was no doubt that the "conduct of infringing on the trade name of Nordstrom caused Nordstrom's injury."  733 P.2d at 211.

### IV.    THE ELEMENTS OF THERMOS'S LACHES DEFENSE

Thermos has asserted laches as an affirmative defense.  Laches is an equitable defense to be determined and applied by the Court.  *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.,* 890 F.2d 165, 170 (9th Cir. 1989).  To assert laches, a defendant must introduce particularized evidence of unreasonable delay and prejudice, to establish that it reasonably relied on a plaintiff's action or inaction to its detriment.  *In Re Thomas R. Beaty and Nancy Z. Beaty*, 306 F.3d 914, 927 (9th Cir. 2002).  It is the defendant's burden to prove the elements of laches by a preponderance of the evidence.  *Couveau v. American Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) (concluding that to establish laches, a defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself).  Additionally, laches does not apply where the infringement is willful.  *Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir. 1955) (holding that in light of the defendant's intentional and fraudulent use of holder's trade-mark, defense of laches to action for infringement was frivolous).  Thermos's infringement was willful.  Even if the defense of latches applied, Thermos has no evidence of detrimental reliance.

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS' TRIAL BRIEF-18-
CV03-1261C JLR

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

## V.      RELIEF AVAILABLE TO PMI

### A.      Injunctive Relief

PMI is entitled to injunctive relief if it establishes any of its claims. *See* 15 U.S.C. § 1116; Wash. Rev. Code § 19.86.090; *Nat'l Football League Properties, Inc. v. Wichita Falls*, 532 F. Supp. 651, 664 (W.D. Wash. 1982) ("An injunction is the standard remedy in unfair competition cases."); *Seattle Taxicab Co. v. De Jarlis*, 236 P. 785 (Wash. 1925).

### B.      Monetary Recovery

#### 1.      Monetary Recovery Under The Lanman Act

Under 15 U.S.C. § 1117, a plaintiff who successfully establishes a trade dress infringement claim may also recover (1) the defendant's profits, (2) any actual damages the plaintiff has sustained, and (3) the costs of the action, including an award for attorney's fees in an "exceptional case."

##### a.      Disgorgement of Profits

An award based on the disgorgement of the defendant's profits is granted either because it is the best measure of the plaintiff's losses or because it prevents a defendant from being unjustly enriched by its infringement. *See McCarthy* § 30:57. The goal of awarding profits is "to take all of the economic incentive out of infringement." *Playboy Enterprises, Inc. v. Baccarat Clothing Co. Inc.*, 692 F.2d 1272, 1275 (9th Cir. 1982). A plaintiff bears the burden of establishing the defendant's gross profits attributable to the infringement, while the defendant has the burden of proving that any permissible deductions from that amount should be taken. *Lindy Pen Co. Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993); *Nintendo of Am. Inc. v. Dragon P. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994).

There is no requirement that the defendant's profits approximate the plaintiff's actual damages for an award based upon a disgorgement of the infringer's profits. *Banjo Buddies, Inc. v. Renosky*, --- F.3d ----, 2005 WL 406242 (3d Cir. 2005). Additionally, while evidence of a

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

defendant's willfulness can be a factor to consider when awarding accounting of infringer's profits, it is not a prerequisite to such an award. *Id.* It is not required that PMI show that it has sustained an actual injury or to provide evidence of actual confusion to obtain an award based on the disgorgement of Thermos's profits. *Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000).

### b.   Actual Damages

To obtain an award based upon its own actual damages, a plaintiff has to show that the damage resulting from the infringement is not remote or speculative. *See Lindy Pen Co. Inc.,* 982 F.2d at 1408. A plaintiff's actual damages are typically measured by any direct injury that the plaintiff can prove, such as the cost of corrective advertising and lost profits that the plaintiff could have earned but for the infringement. *See Lindy Pen Co. Inc.*, 982 F.2d at 1407-08; *U-Haul Int'l Inc. v. Jartan Inc*., 793 F.2d 1034, 1053 (9th Cir. 1986); *McCarthy*, at §§ 30:77, 30:79-80, 30:85, 30:87. A plaintiff can also recover the costs of future advertising which must be undertaken to restore the value of the infringed mark. *Adry v. Adry-Mart Inc*., 76 F.3d 984, 985-89 (9th Cir. 1996) (affirming an award for prospective correct advertising to dispel the confusion caused by the defendant's infringement).

The Ninth Circuit permits substantial flexibility in the calculation of monetary recovery in infringement claims, but a plaintiff cannot recover both the defendant's profits and its own lost profits if the result is overcompensation for the same injury. *Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 620 (9th Cir. 1993). In order to establish damages based on its own lost profits, a plaintiff must be able to reasonably forecast its lost profits. *See Lindy Pen Co. Inc*., 982 F.2d at 1407. This can be done by multiplying the trademark owner's profit margin by the number of infringing items sold by the defendant <u>or</u> by comparing a plaintiff's current profits to a time period before the infringing conduct began. *See Intel Corp*. 6 F.3d at 621; *McCarthy*, at §§ 30:79.

**Dorsey & Whitney llp**
U.S. Bank Building Centre
1420 Fifth Avenue, Suite 3400
Seattle, Washington 98101
Phone: (206) 903-8800
Fax: (206) 903-8820

1

### c.   Costs and Fees

2

A court may award costs and reasonable attorney's fees to a plaintiff prevailing on a

3

Lanham Act trade dress infringement claim in "exceptional cases."  "The term 'exceptional

4

cases' is generally accepted to mean cases in which trademark infringement is 'deliberate and

5

willful.'"  *Philip Morris USA, Inc. v. Castworld Products, Inc*., 219 F.R.D. 494, 502 (C.D. Cal.

6

2003) (citing  *Lindy Pen Co. Inc*., 982 F.2d at 1409 (affirming district court's denial of attorney's

7

fees where the infringement was not intentional)); *see also Intel Corp.*, 6 F.3d at 621 (upholding

8

an attorney's fees award where the defendant's infringement was knowing and intentional);

9

*Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 825 (9th Cir.1996) (same); *Playboy

10

Enterprises, Inc.*, 692 F.2d at 1276 (upholding an attorney's fees award where the defendant's

11

infringement was flagrant and willful).  "The word 'willful' is widely used in the law, and,

12

although it has not by any means been given a perfectly consistent interpretation, it is generally

13

understood to refer to conduct that is not merely negligent," but is commonly synonymous with

14

the terms "voluntary," "deliberate," and "intentional."  *McLaughlin v. Richland Shoe Co*., 486

15

U.S. 128, 133 (1988).

16

### 2.   Monetary Recovery Under The Washington Consumer Protection Act

17

A successful plaintiff in a private CPA action can recover its own actual damages and the

18

costs of the suit, including reasonable attorney's fees. Wash. Rev. Code § 19.86.090.  Actual

19

damages may be trebled, up to $10,000 per CPA violation, at the discretion of the court.  *Id*.  A

20

plaintiff need only show that it has suffered an injury (it need not be monetary damages) in order

21

to recover attorney's fees.  *Mason*, 792 P.2d at 149.

22

### VI.   DISPUTED JURY INSTRUCTIONS

23

PMI has almost exclusively proposed jury instructions that are either from the Ninth

24

Circuit Model Civil Jury Instructions, or the Washington Pattern Jury Instructions, Civil.  The

25

only instructions in which PMI has deviated from the model instructions are those where the

PLAINTIFFS' TRIAL BRIEF-21-
CV03-1261C JLR

**DORSEY & WHITNEY LLP**
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

1    model instruction is a general trademark instruction, not appropriate for this product design
2    configuration trade dress case.  Where PMI has modified a model instruction, it has done so by
3    reference to the accepted Ninth Circuit standard for the issue at hand.  In contrast, Thermos has
4    proposed alternative jury instruction language and alternative jury instructions that substantially
5    deviate from the model instructions and are unsupported by applicable Ninth Circuit law.
6    Thermos relies heavily on cases from other jurisdictions, and on unpublished cases, in violation
7    of the Ninth Circuit's prohibition of citation of unpublished cases.  Ninth Circuit Rule 36.3; *Hart*
8    *v. Massanari*, 266 F.3d 1155 (9th Cir. 2001).  Further, Thermos's proposed alternative language
9    and alternative jury instructions are rife with argument.   As such, of the disputed jury
10   instructions, the Court should adopt the instructions and language proposed by PMI.

12   Respectfully submitted this 14th day of March, 2005.

     DORSEY & WHITNEY LLP

13   *s/ Peter Ehrlichman*
     PETER EHRLICHMAN WSBA #6591
14   TODD FAIRCHILD WSBA # 17654
     SHANNON MCMINIMEE WSBA #34471
15   U.S. Bank Centre
     1420 Fifth Avenue, Suite 3400
16   Seattle, WA 98101-4010

17   BLACK LOWE & GRAHAM LLP
18   MICHAEL J. FOLISE, WSBA #15266
     701 Fifth Avenue, Suite 6300
19   Seattle, WA  98104

20   Attorneys for Pacific Market, Inc. and Pacific Market International, L.L.C.

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820

## CERTIFICATE OF SERVICE

I certify that on March 14, 2005, I caused to be served a true copy of the foregoing PLAINTIFFS' TRIAL BRIEF using the CM/ECF System electronic filing to:

David H. Binney at daveb@prestongates.com, kdavis @prestongates.com

Kevin J Byrne at kbyrne@schiffhardin.com

Becky V. Christensen at bvc@ocmiplaw.com

James A. Clark at jclark@schiffhardin.com

Michael J. Folise at mikef@seedip.com, litcal @seedip.com

Sondra A Hemeryck at shemeryck@schiffhardin.com

William E. Levin at wel@levin-oconnor.com

Marc C. Levy at marcl@prestongates.com, leaw@prestongates.com

Paula J. Morency at pmorency@schiffhardin.com

Edward F. O'Connor at efo@ocmiplaw.com

DATED this 14th day of March, 2005.

s/ Shannon M. McMinimee
SHANNON M. MCMINIMEE

CERTIFICATE OF SERVICE-23-
CV03-1261JLR
4836-2930-7648\1

DORSEY & WHITNEY LLP
U.S. BANK BUILDING CENTRE
1420 FIFTH AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101
PHONE: (206) 903-8800
FAX: (206) 903-8820