HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PACIFIC MARKET, INC., a Washington corporation, and PACIFIC MARKET INTERNATIONAL, L.L.C., a Washington limited liability company, collectively d/b/a PACIFIC MARKET INTERNATIONAL,

                                        Plaintiffs,

        v.

THERMOS L.L.C., a Delaware limited liability company,

                                        Defendant.

No. CV03-1261-JLR

**DEFENDANT'S TRIAL BRIEF**

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1

# TABLE OF CONTENTS

Page

Selected Relevant Facts .......................................................................................... 1

Legal Authority ...................................................................................................... 2

    A.    Product Design Trade Dress Claims Must be Evaluated Differently
            Than Trademark and Product Packaging Trade Dress Claims ..................... 3

    B.    PMI's Claimed Trade Dress is Functional ................................................... 6

           1.    Any Utilitarian Advantage of the Design ......................................... 7

           2.    The Availability of Alternative Designs ............................................ 8

           3.    Advertising Touting the Utilitarian Advantages of the Design ......... 11

           4.    Simple or Inexpensive Methods of Manufacture ............................. 12

    C.    PMI's Claimed Trade Dress is Generic ....................................................... 13

    D.    PMI's Claimed Trade Dress Lacks Secondary Meaning ............................. 15

           1.    Image or "Look For" Advertising ................................................... 23

           2.    Use of the Trade Dress to Increase Sales ......................................... 26

           3.    Extent of Exclusive Use .................................................................. 27

           4.    Actual Confusion ............................................................................ 28

           5.    Intentional Copying ........................................................................ 28

    E.    PMI Cannot Establish A Likelihood of Confusion ...................................... 30

           1.    Strength or Weakness of the Claimed Trade Dress .......................... 31

            2.    The Proximity of the Goods ............................................................ 31

            3.    Similarities and Differences Between the Goods
               and their Packaging ........................................................................ 31

           4.    Actual Confusion ............................................................................ 32

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

5.  Intent to Confuse ................................................................ 32

6.  Marketing/Advertising Channels ......................................... 33

7.  Purchaser's Degree of Care ................................................ 33

8.  Product Labeling ................................................................ 33

F.  Aladdin Did Not Transfer to PMI the Claimed Trade Dress
Rights Before This Lawsuit Was Filed ......................................... 34

G.  PMI's State Law Claims Also Fail .............................................. 36

1.  Washington State Law Requires that PMI's State
Law Claims Must Be Decided Under Federal Trade
Dress Infringement Standards .......................................... 36

    a.  PMI's Consumer Protection Act Claim
    Must Be Decided in Accordance With
    Federal Standards .................................................. 36

    b.  PMI's Claim for Common Law Unfair Competition
    Must Be Decided in Accordance with Federal Standards ..... 38

2.  Federal Law Requires that PMI's State Law Claims
Must Be Decided Under Federal Standards ...................... 39

H.  PMI's Claims Are Barred By Laches ........................................... 40

I.  PMI is Not Entitled to Monetary Recovery................................... 42

1.  Defendant's Profits.............................................................. 42

2.  Actual Damages.................................................................. 44

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    This case arises from PMI's efforts to stifle effective, innovative competition that took

2    direct aim at its green Stanley beverage bottle (the "Stanley bottle").   Thermos competed

3    fairly, and entirely within the law. It developed a new and effective competitor to the green

4    Stanley bottles, without violating any protectable trade dress rights in doing so.   Because

5    Thermos did not violate the Lanham Act or any corresponding state statutes, Thermos will ask

6    the jury for a verdict in its favor.

7    **<u>Selected Relevant Facts</u>**

8    Thermos and its predecessors have been selling insulated bottles for one hundred

9    years.  Although Thermos is the largest seller in many segments of the market, the one-quart

10   green Stanley bottles had long been a strong seller among blue-collar workers.  In an effort to

11   compete more effectively with the green bottle, Thermos began a project to design a better

12   bottle – a "Stanley Killer" bottle – that would appeal to the target consumers. Thermos

13   retained an independent design firm to assist it in developing a strong competitor to the green

14   Stanley.  Thermos also used an outside marketing consulting firm to conduct focus group

15   sessions with current Stanley bottle owners to find out what they did and did not like about

16   that product. Thermos then chose a slender, compact, black-and-blue competitor with a

17   tapered stainless steel top and a press-fit stainless steel base.  Named the THERMOS® Work

18   Series bottle, the bottle bears the prominent Thermos® trademark on its front, handle, base,

19   packaging and hang tags.

20   The evidence will show that Thermos made a conscious choice to distinguish its

21   product from the green Stanley bottle it hoped to displace.  Thermos pursued a new design

22   and color, and chose not to use the Stanley green, the Stanley cup, the Stanley handle and

23   other Stanley features.  The substantial differences – including color – are apparent.  Since

24   August of 2002, when it was first introduced, the Thermos bottle has proven popular with

25   consumers.

26   Survey expert Philip Johnson conducted a survey on likelihood of confusion among

DEFENDANT'S TRIAL BRIEF - 1
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the target market for the Work Series bottle, using protocols that have been approved repeatedly by federal courts. His was the only survey conducted on that issue, and found no meaningful likelihood of confusion within the target market. The preponderance of the evidence therefore will show that no appreciable number of consumers associate the blue THERMOS® Work Series bottle with the Stanley name or its owner.[1]

Finally, PMI will be unable to meet its burden of establishing that its alleged damages were caused by any infringement of protectable trade dress. The evidence will show that customers had ample reason to prefer the style, increased capacity, smaller profile and footpad of the THERMOS® Work Series bottle. The green Stanley faced formidable competition from other brands, including PMI's own more modern Stanley BOLT vacuum bottle.

PMI has tried several ways to knock out a bottle they have been unable to overcome in the marketplace. Last week, for example, PMI tendered for the first time a completely different definition of its trade dress, which now apparently consists of all the elements of its bottle except the signature green color and the handle criticized by focus groups. It then tendered a proposed jury instruction with an entirely new definition, to which Thermos strongly objects. Even the shifting trade dress definition, though, cannot obscure PMI's inability to satisfy its burden of proving that Thermos violated any protectable rights under applicable federal or state law.

### Legal Authority

PMI claims that Thermos unfairly competed with it by infringing PMI's alleged trade dress rights in the Stanley bottle in violation of Section 43(a) of the Lanham Act, Washington unfair competition law and the Washington Consumer Protection Act (the "CPA").

---

[1] As set forth below, the evidence will also establish that the product features for which PMI seeks protection are both functional and generic, lack secondary meaning, and thus are not entitled to the protection PMI seeks.

DEFENDANT'S TRIAL BRIEF - 2
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

To succeed on its claims, PMI must prove each of the following:  (1) Aladdin Industries assigned to PMI the claimed trade dress rights, together with all of the good will associated with such rights, before the filing of this lawsuit; (2) PMI's claimed trade dress is non-functional; (3) PMI's claimed trade dress is not generic; (4) the claimed trade dress in the Stanley bottle has acquired secondary meaning; (5) the THERMOS® Work Series Bottle uses nonfunctional and non-generic design elements similar to the claimed trade dress elements in the Stanley bottle in a manner likely to cause confusion among an appreciable segment of ordinary purchasers as to the source of the Thermos Work Bottle; and (6) PMI suffered damage from Thermos's infringement.

PMI's state law unfair competition claim is subject to the same substantive standards and burden of proof as its federal Lanham Act claim.  PMI's claim that Thermos violated the CPA also requires PMI to prove that Thermos infringed PMI's claimed trade dress rights. However, the CPA imposes additional requirements that PMI must prove to establish a violation of the statute.  PMI therefore cannot prevail on either of its state law claims in this case without also prevailing on its Lanham Act claim.

Thermos has asserted laches as an equitable defense which, if proven, would bar each of PMI's claims.  The parties agree that the Court rather than the jury should decide the laches defense because laches is an equitable doctrine.

### A.   Product Design Trade Dress Claims Must Be Evaluated Differently Than Trademark and Product Packaging Trade Dress Claims.

"[T]here exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws." Leatherman Tool Group, Inc. v. Cooper Indus., Inc., 199 F.3d 1009, 1011-12 (9th Cir. 1999) (quoting In re Morton-Norwich Prods., Inc., 671 F.2d 1332, 1336 (C.C.P.A. 1982) (emphasis in original)).  In a competitive economy, the right to copy products and product features (subject to restrictions imposed by policies reflected in our patent and copyright laws) plays

DEFENDANT'S TRIAL BRIEF - 3
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

an important role by fueling improvements in product quality and lower prices for consumers through competitive forces in a free market.  Thus, the Supreme Court has explained that "[a]llowing competitors to copy [has] salutary effects in many instances."  TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 29 (2001).  It is critical, therefore, that courts not allow trade dress law to prevent businesses "from using a design identical to [their competitors] and to require those competitors to adopt a different design simply to avoid copying it."  Id. at 35.  As the Ninth Circuit has explained:

> [I]t is not the purpose of unfair competition law, under the guise of either consumer protection or the protection of business good will, to implement a policy of encouraging innovative designs by protecting them once designed.  Those issues are the province of copyright and patent laws. . . .We believe that courts should exercise restraint so as not to undermine Congress's repeated determinations not to afford virtually perpetual protection to product configurations with an expansive construction of section 43(a).  What Congress has, for the great span of this century, been unwilling to do, . . . should not be effected by the judiciary.

Leatherman, 199 F.3d at 1012 (quoting Duraco Prods., Inc. v. Joy Plastic Enterprises, Ltd., 40 F.3d 1431, 1446-47 (3d Cir. 1994)).

"Because affording trade dress protection to product designs may hinder legitimate competition, the Ninth Circuit has advised district courts to evaluate such claims with greater scrutiny than claims involving other forms of trade dress."  Continental Lab. Prods., Inc. v. Medax Int'l Inc., 114 F. Supp. 2d 992, 997 (S.D. Cal. 2000) (citing Leatherman, 199 F.3d at 1012-13).  In the year following the Ninth Circuit's 1999 decision in Leatherman, the Supreme Court expressly recognized the importance of distinguishing product design trade dress cases from those that involve either trademarks or other types of trade dress such as product packaging cases and restaurant/service establishment décor cases.  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 212-15 (2000) (noting that restaurant décor "seems to us not to constitute product design" but rather either product packaging "or some *tertium*

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    *quid* that is akin to product packaging"). Explaining that the principles historically applied in

2    cases involving word marks and product packaging trade dress were founded upon the

3    assumption that consumers normally understand trademarks and product packaging to be

4    indicators of origin, the Court noted this consumer predisposition is simply not present with

5    product designs.  Id. at 212-13.  Rather, "[c]onsumers are aware of the reality that, almost

6    invariably, even the most unusual of product designs . . . is intended not to identify the source,

7    but to render the product more useful or more appealing."  Id. at 213.

8        The following year, the Supreme Court again took the opportunity in its decision in

9    TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23 (2001) to emphasize the

10   importance of reconciling a competitor's right to copy unpatented product designs with the

11   trade dress principles that had developed under the Lanham Act.  Noting that, in general,

12   "unless an intellectual property right such as a patent or copyright protects an item, it will be

13   subject to copying," the Court held that "trade dress protection must subsist with the

14   recognition that in many instances there is no prohibition against copying goods and

15   products."  Id. at 29.

16       Recognizing these important distinctions, lower courts have adjusted the analysis

17   normally applied in trademark and product packaging trade dress cases to ensure that

18   competitors' rights to compete effectively are not undermined in product design trade dress

19   cases.  See, e.g., Yankee Candle Co., Inc. v. Bridgewater Candle Co., 259 F.3d 25, 44-45 (1st

20   Cir. 2001) ("[I]ntent plays a particularly minor role in product design/configuration cases");

21   Bonazoli v. R.S.V.P. Int'l, Inc., 353 F. Supp. 2d 218, 228-29 (D.R.I. 2005) ("'[A]ttempts to

22   copy . . . will quite often *not* be probative [because] the copier may very well be exploiting a

23   particularly desirably feature, rather than . . . confus[ing] consumers as to the source of the

24   product.'" (quoting Duraco Prods., Inc. v. Joy Plastic Enterprises, Ltd., 40 F.3d 1431, 1453

25   (3d Cir. 1994) (emphasis added))); Continental Lab. Prods., 114 F. Supp.2d at 1009-1012

26   ("The Supreme Court has recently made clear . . . that product design cases trigger

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

considerations and policies that do not arise in cases involving word marks and product packaging, which can affect the legal requirements for distinctiveness.  Thus, applying the deliberate copying rule to product designs mandates a reassessment of its effectiveness.") (citing Wal-Mart, 529 U.S. 205); Mega Mfg., Inc. v. Haco-Atlantic, Inc., No. 00 C 2318, 2000 WL 705989, at *6 (N.D. Ill. May 22, 2000) ("Many of the seven [likelihood of confusion analysis] factors are inappropriate, or do not even function in the same way, with respect to trade dress inhering in a product configuration.  In a product configuration trade dress infringement case, the primary factors to be considered in assessing likelihood of confusion are the product's labeling, packaging and advertisements.") (internal citations and quotations marks omitted).

Therefore, because "it is, and should be, more difficult to claim product configuration trade dress than other forms of trade dress," Leatherman, 199 F.3d at 1013, PMI is obliged to overcome each of the high hurdles required to establish its claims in this product design trade dress case.

**B.      PMI's Claimed Trade Dress Is Functional**

PMI's first extraordinary hurdle is proving non-functionality. Trade dress protection may not be claimed for product features that are functional.   TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 29 (2001).   PMI must overcome the statutory presumption that its claimed trade dress is functional until PMI proves otherwise.  15 U.S.C. § 1125(a)(3).

The presumption is not easily overcome.  A product design feature is functional if (1) it is essential to the product's use or purpose; (2) it affects the product's cost or quality; or (3) a competitor would be put at a significant non-reputation related disadvantage if it could not use the feature.  TrafFix, 532 U.S. at 32-33; Ninth Circuit Model Civil Jury Instructions § 18.10 and Further Comments thereto.

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

In this case, PMI claims that the following external features comprise the trade dress of the Stanley bottle:

(a) a base of constant diameter substantially throughout its length;

(b) a tapered or torpedo like overall look and appearance from bottom to top generated from the top or cap being a diameter that is less than the body;

(c) a body bearing a crinkled finish with a solid color;

(d) a top or cap and band at the base of the body bearing the appearance of a stainless steel finish; and

(e) a band at the base of the top or cap with a color that substantially matches the color of the body.

Amended Pretrial Order, at 3, ¶ 3.  PMI cannot carry its burden of proving that these elements are non-functional, whether the elements are considered individually or in combination.

The Ninth Circuit looks to four factors as guides in determining whether the design of a product or product feature is functional or nonfunctional:  "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture."  Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1006 (9th Cir. 1998).  The law applicable to each of these factors is discussed briefly below.

1.     Any Utilitarian Advantage of the Design.

The law is quick to find a utilitarian advantage and unforgiving in considering nonfunctionality.   "A product feature need only have *some* utilitarian advantage to be considered functional."  Disc Golf, 158 F.3d at 1007 (emphasis in original).  If a product is in a particular shape or design because it works better in that shape or design, the shape or design is functional.  Leatherman, 199 F.3d at 1012 (citing Textron, Inc. v. U.S. Int'l Trade

DEFENDANT'S TRIAL BRIEF - 7
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    Comm'n, 753 F.2d 1019, 1025 (Fed. Cir. 1985)).  A product design feature need not provide a

2    superior utilitarian advantage in order to be functional.  Disc Golf 158 F.3d at 1007-08.

3    Rather, "'to establish non-functionality, the party with the burden must demonstrate that the

4    product feature serves no purpose other than identification.'"  Id. (quoting Sega Enters. Ltd. v.

5    Accolade, Inc., 977 F.2d 1510, 1531 (9th Cir. 1992)).

6        "Functional features of a product are features which constitute the actual benefit that

7    the consumer wishes to purchase, as distinguished from an assurance that a particular entity

8    made, sponsored, or endorsed a product."  See Further Comments to Ninth Circuit Model

9    Civil Jury Instructions § 18.10 (quoting Vuitton et Fils S.A. v. J. Young Enters., 644 F.2d

10   769, 774 (9th Cir. 1981) (internal quotation marks omitted)).  See also Kendall-Jackson

11   Winery, Ltd. v. E & J Gallo Winery, 150 F.3d 1042, 1050 (9th Cir. 1998) (holding that a

12   reasonable jury could conclude that combination of exposed cork, a rounded flange and a

13   neck label was functional because these features "create the 'California look,' which

14   consumers [have] come to expect from a California wine"); Brunswick Corp. v. British

15   Seagull Ltd., 35 F.3d 1527, 1531 (Fed. Cir. 1994) (holding that although black color of

16   outboard motors "does not make the [boat] engines function better as engines" and does not

17   affect the "mechanical purpose" of the engines, black was functional because it decreases the

18   apparent size of the motor and ensures compatibility with many different boat colors and as

19   such "[c]olor compatibility and ability to decrease apparent motor size are not in this case

20   mere aesthetic features").

21       Each element that PMI claims as its trade dress yields a utilitarian advantage.

22              2.    The Availability of Alternative Designs

23       Although evidence of available alternative designs may still be considered in making

24   the determination of whether the claimed trade dress is functional or merely ornamental in the

25   first place, its significance in evaluating the functionality of the claimed trade dress has been

26

DEFENDANT'S TRIAL BRIEF - 8
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    diminished substantially by the Supreme Court's decision in <u>TrafFix</u> and the Ninth Circuit's

2    decision in <u>Talking Rain Beverage Co. v. South Beach Beverage Co.</u>, 349 F.3d 601 (9th Cir.

3    2003).  In <u>TrafFix</u>, the Supreme Court held that once a product design feature has been found

4    to be functional because it affects the cost or quality of the product or because it is essential to

5    the product's use or purpose (<i>i.e.</i>, the test the Court formulated in <u>Inwood Labs., Inc. v. Ives</u>

6    <u>Labs, Inc.</u>, 456 U.S. 844 (1982)), "[t]here is no need . . . to engage . . . in speculation about

7    other design possibilities . . . which might serve the same purpose.  <u>TrafFix Devices, Inc. v.</u>

8    <u>Marketing Displays, Inc.</u>, 532 U.S. 23, 33 (2001).  <u>See also</u> <u>Talking Rain</u>, 349 F.3d at 603

9    (holding that after <u>TrafFix</u>, "the existence of alternative designs cannot negate a trademark's

10   functionality"); <u>Antioch v. Western Trimming Corp.</u>, 347 F.3d 150, 157 (6th Cir. 2003)

11   (finding no error in district court's rejection of proffered evidence on alternative designs,

12   based on <u>TrafFix</u>, once it found features functional).

13         Even if a defendant could have achieved the same functionality by adopting a different

14   design than the one it chose, the existence of available alternatives does not render the product

15   design feature non-functional.  <u>Talking Rain</u>, 349 F.3d at 604.  While the Ninth Circuit still

16   permits evidence of available alternative designs to be considered because the Ninth Circuit

17   believes such evidence may be helpful in indicating whether the claimed trade dress embodies

18   functional or merely ornamental aspects of the product, the court has made it clear that such

19   evidence must not be used to negate the functionality of a product design feature otherwise

20   found to be functional under the Supreme Court's <u>Inwood</u> test.  <u>Talking Rain</u>, 349 F.3d at

21   603.

22         Further, the law strictly limits the use of alternative-design evidence.  Any alternative

23   designs that PMI offers into evidence at trial must be shown to be commercially viable

24   alternatives.  Evidence of proffered design alternatives without sales or market share data

25   showing the proposed alternative to be commercially viable, for example, is insufficient.  <u>See</u>

26   <u>Disc Golf Ass'n, Inc. v. Champion Discs, Inc.</u>, 158 F.3d 1002, 1009 (9th Cir. 1998) (rejecting

DEFENDANT'S TRIAL BRIEF - 9
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

plaintiff's proposed alternative designs offered without sales or market share data as insufficient to support an inference of commercial viability).   Moreover, the number of commercially viable alternative designs must be shown to be sufficient to ensure that providing exclusivity of the claimed trade dress to a single seller would not hinder competition.   Id. at 1009 (citing J.T. McCarthy, McCarthy on Trademarks and Unfair Competition § 7:75 at 7-156 (4th ed. 1998) (hereinafter "McCarthy on Trademarks")).

The commercially viable alternative obligation is also stringent.  The Ninth Circuit, in both its opinion in Leatherman and its more recent decision in Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 786 (9th Cir. 2002), held that it is inappropriate to consider, as commercially viable alternative designs, products that effectively perform the same function as the plaintiff's product but do not offer "exactly the same" functionality as the product features that the plaintiff claims as its trade dress.  In Leatherman, for example, the court discounted the significance of other tool designs offered at trial as possible alternatives to the features of the tool that plaintiff Leatherman claimed as its trade dress:

> Nor can the fact that there are many other multifunction tools with a variety of appearances . . . preclude [defendant] from faithful copying of the PST.  While it is appropriate to look to possible alternatives when judging whether a design is functional, the evidence judging here was unequivocal that none of the alternatives offered the same functionality as the PST.  Even though many of the tools likely are highly functional and useful, none of them offer *exactly* the same features as the PST.  For example, a particular alternative design might be substantially larger than the PST.  As such, it might actually be *preferred* by a customer seeking a heavier-duty tool to keep in the car.  A customer looking for a tool to carry in a pocket every day, though, might prefer the compactness of the PST.  Leatherman does not have the right to preclude competition in any particular subset of the overall market.

Leatherman, 199 F.3d at 1013-14 (emphasis in original).

The broad principle of functionality stated in Leatherman and Tie Tech provides for

DEFENDANT'S TRIAL BRIEF - 10
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    finding functionality even if only a portion of the consumers prefer some aspect of the

2    product.  A plaintiff "does not have rights under trade dress law to compel its competitors to

3    resort to alternative designs which have a different set of advantages and disadvantages."  Id.

4    at 1014 n.7.  A product design feature is functional if some customers prefer a specific

5    functional aspect of the product, even though other functional designs may get the job done

6    just as well.  Tie Tech, 296 F.3d at 786.  If a subset of the overall market such as the blue

7    collar tradesmen segment, for example, prefers particular aspects of the Stanley bottle, these

8    design features are functional notwithstanding the commercial success of other designs in the

9    market as a whole.  Id. at 786-87.  The trade dress laws protect only "a customer's desire to be

10   assured that a particular entity made, sponsored, or endorsed a product" and not a

11   competitor's ability to monopolize product features that may be preferred by segments of the

12   market.  Id. at 786-87 (citations omitted).

### 3.    Advertising Touting the Utilitarian Advantages of the Design

14        Advertising that touts the utilitarian advantage of the product's design indicates

15   functionality.  The evidence at trial will cut strongly against PMI on this factor.  For years,

16   Aladdin and PMI have promoted the Stanley bottle as a rugged, tough and durable bottle.

17   Having contributed through its own advertising to the consumer perception that the features of

18   the Stanley bottle are designed for a tough environment in which a tough, durable bottle is

19   needed, PMI cannot now preclude its competitors from using the same rugged appearing

20   features on competing bottles.  Moreover, as the Ninth Circuit has made clear, the advertising

21   need not expressly tie the utilitarian advantages to the claimed trade dress elements.  Disc

22   Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1007-09 (9th Cir. 1998).  It is

23   enough if the claim is implicit in the advertising.  Id. at 1009.  Advertising touting the

24   utilitarian advantages of the claimed trade dress is "strong evidence of functionality."  Id.

25

26

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

4.     Simple or Inexpensive Methods of Manufacture

PMI must prove that vacuum-insulated bottles having the elements that PMI claims as its trade dress are not relatively simple or inexpensive to manufacture.  The evidence at trial will show that at least some of these elements provide certain advantages during the production process.

Because PMI likely will recognize that it cannot prove that the individual elements of its claimed trade are non-functional, it may argue that it is seeking to protect only the overall look of the Stanley bottle that is achieved through the combination of the functional elements comprising its claimed trade dress.  This claim also must fail. "For an overall product configuration to be recognized as a trademark, the entire design must be nonfunctional." Leatherman Tool Group, Inc. v. Cooper Indus., Inc., 199 F.3d 1009, 1012 (9th Cir. 1999). "[T]he right to copy better working designs would, in due course, be stripped of all meaning if overall functional designs were accorded trademark protection because they included a few arbitrary and nonfunctional features." Id. (quoting Textron, Inc. v. U.S. Int'l Trade Comm'n, 753 F.2d 1019, 1024 (Fed. Cir. 1985)).

The Ninth Circuit rejected efforts to play semantic games aimed at hindering legitimate marketplace competition in both Leatherman and Tie Tech.  See Leatherman, 199 F.3d at 1013; Tie Tech, Inc. v. Kinedyne Corp., 296 F.3d 778, 786 (9th Cir. 2002). The words of the court in Leatherman apply forcefully to PMI's claim:

> [W]here the whole is nothing other than an assemblage of functional parts, and where even the arrangement and combination of parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate "overall appearance" which is non-functional.  If it is permissible to draw a distinction between such an object and its "general appearance," then virtually nothing is utilitarian, and virtually the only product designs which could be copied faithfully are those which are widely used and therefore in the public domain.

DEFENDANT'S TRIAL BRIEF - 12
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    Leatherman, 199 F.3d at 1013.  See also Tie Tech, 296 F.3d at 786 (rejecting argument that

2    "the overall appearance of [the plaintiff's product], and not its separate functional parts, is

3    what deserves protection as a non-functional aspect of its configuration").

4         PMI has not claimed (and cannot prove) that the elements of its trade dress are

5    configured or arranged in some sort of a fanciful or arbitrary way in the Stanley bottle.  The

6    elements of the claimed trade dress – the base, the body, the cup, and the plastic band around

7    the lip of the cup – are configured in a conventional vacuum bottle arrangement chosen as a

8    matter of basic engineering design to perform the function of a vacuum-insulated bottle and

9    attached drinking cup/cap.

10        Moreover, if the essential element (or elements) of a claimed overall combination of

11   elements is functional, the claimed combination of elements cannot be protected as trade

12   dress.  The Supreme Court made this clear in its decision in TrafFix.  532 U.S. 23, 30, 34

13   (2001) (focusing solely on the functionality of single feature as the "essential" one in the

14   plaintiff's claimed combination of features and dismissing the others as superfluous).  See

15   also Antioch v. Western Trimming Corp., 347 F.3d 150, 159 (6th Cir. 2003) ("TrafFix

16   Devices teaches that where an engineering design feature is the core component of the overall

17   trade dress, a court may focus on the functionality of that key feature.").  If PMI cannot prove

18   the non-functionality of the essential element or elements of its claimed trade dress, its

19   Lanham Act and related state law claims must fail.

20        **C.    PMI's Claimed Trade Dress Is Generic**

21        Thermos has asserted genericness as a defense to PMI's allegation that the Thermos

22   Work bottle infringes the claimed trade dress of the Stanley bottle.  See Answer to Second

23   Amended Complaint at 4, ¶ 2; Amended Pretrial Order at 5, ¶ 2.  If PMI's claimed trade dress

24   is generic, then it is unprotectable even if PMI proves that its trade dress has acquired

25   secondary meaning.  Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir. 2001)

26

DEFENDANT'S TRIAL BRIEF - 13
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    ("even a showing of secondary meaning is insufficient to protect product designs that are

2    overbroad or 'generic'"); Big Island Candies, Inc. v. Cookie Corner, 269 F. Supp. 2d 1236,

3    1251 (D. Haw. 2003); Indonesian Imports, Inc. v. Smith, Nos. 97-3534, 98-2494, 1999 WL

4    183629, at *8 (N.D. Cal. Mar. 30, 1999).

5        Because Thermos has raised genericness as a defense – (and because PMI's claimed

6    trade dress is not federally registered) – PMI bears the proving that its claimed trade dress is

7    nongeneric.  Filipino Yellow Pages, Inc. v. Asian Journal Pubs., Inc., 198 F.3d 1143, 1146

8    (9th Cir. 1999) ("If a supposedly valid mark is not federally registered . . . the plaintiff has the

9    burden of proving genericness once the defendant asserts genericness as a defense."); Big

10   Island Candies, 269 F. Supp. 2d at 1242 ("Because [defendant] has raised the defense of

11   genericness, [plaintiff] has the burden of showing that the [plaintiff's cookie] design is not

12   generic."); Norm Thompson Outfitters, Inc. v. Starcrest Prods. of California, Inc., No. 03-

13   1149, 2004 WL 957774, at *2 (D. Or. May 4, 2004) (plaintiff bears burden of proving

14   nongenericness where defendant asserted that unregistered mark was generic); Yellow Cab of

15   Sacramento v. Yellow Cab Co. of Elk Grove, Inc., 266 F. Supp. 2d 1199, 1203 (E.D. Cal.

16   2003) (same).

17       There are a number of ways in which PMI's claimed trade dress may be generic, and

18   therefore unprotectable.  See Big Island Candies, 269 F. Supp. 2d at 1244 ("[T]here may be

19   more than one applicable form of 'genericness' in a product design case.").  First, PMI's

20   claimed trade dress may be generic "if it is overbroad or too generalized."  Id. at 1243; see

21   also Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc., 58 F.3d 27, 34 (2d Cir. 1995) (trade

22   dress for which plaintiff sought protection was "generalized idea" and therefore "generic").

23   Second, PMI's claimed trade dress may be generic if it is the basic, or even a basic form of a

24   type of product.  Big Island Candies, 269 F. Supp. 2d at 1244; see also Indonesian Imports,

25   1999 WL 183629, at *6 (refusing trade dress protection for crocheted handbag due to

26   genericness).  Third, PMI's claimed trade dress may be generic "because it is so common in

DEFENDANT'S TRIAL BRIEF - 14
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the industry or in the marketplace that it cannot be said to identify any particular source." <u>Big Island Candies</u>, 269 F. Supp. 2d at 1244; <u>Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery</u>, 150 F.3d 1042, 1049 (9th Cir. 1998) (holding that grape leaf design on wine bottles had become generic because design was "used widely in the industry"); <u>Indonesian Imports</u>, 1999 WL 183629, at *6 (general shape of handbag was generic because "common" and "widely produced" in the industry).

Accordingly, PMI can carry its burden of proving nongenericness only if it can establish that its claimed trade dress is not generic in any of the above-described senses. Moreover, even if PMI can show that not all the features of its claimed trade dress are generic, its claimed trade dress, viewed as a whole, may be generic if it is found to consist of some combination of generic and functional elements. <u>See</u>, <u>e.g.</u>, <u>Jeffrey Milstein</u>, 58 F.3d at 32 (trade dress consisting solely of "commonly used" and functional elements was generic and therefore unprotectable); <u>Indonesian Imports</u>, 1999 WL 183629, at *7 (finding plaintiff's trade dress generic in part because plaintiff failed to produce any evidence that the "generic and otherwise unprotectable features [of plaintiff's trade dress] are combined together in a unique and source identifying way").

### D.    PMI's Claimed Trade Dress Lacks Secondary Meaning

In 2000, the Supreme Court held that no product configuration may be protected from infringement under the Lanham Act without proof of secondary meaning. <u>Wal-Mart Stores, Inc. v. Samara Bros.</u>, 529 U.S. 205, 216 (2000).  That holding was another narrowing the scope of permissible trade dress claims, particularly in product design cases.  As explained above, <u>see</u> Section A, *supra*, parties claiming infringement of product designs under the Lanham Act face extraordinary hurdles.

To establish secondary meaning, PMI must prove that the <u>primary</u> significance of a product feature is to identify the product's source rather than the product itself. <u>Inwood Labs,</u>

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Inc. v. Ives Labs, Inc., 456 U.S. 844, 851 n.11 (1982).  The courts have been unflinching in enforcing the narrowed scope of trade dress protection:

> While some have suggested that the primary significance test is too stringent, particular for product design cases, we reject any lesser test.

I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 42 (1st Cir. 1998).

PMI must prove, therefore, that consumers see the design of the Stanley bottle not as a bottle with a particular combination of size, shape, color, and texture but rather that those design factors serve first and foremost in the consumer's mind to indicate  that this bottle comes from a particular source.  A product's design does not have secondary meaning, no matter how unique it is, and no matter how long it has been used exclusively by one manufacturer, unless it is shown that the design serves <u>primarily</u> to identify the source rather than as a part of the product itself.

PMI's burden to prove that its product design serves primarily to identify a source is daunting.  No less than the United States Supreme Court has explained that "product design almost invariably serves purposes other than source identification."  <u>Wal-Mart</u>, 529 U.S. at 213.  That is because consumers "are aware of the reality that, almost invariably, even the most unusual of product designs–such as a cocktail shaker shaped like a penguin–is intended not to identify the source, but to render the product itself more useful or more appealing."  <u>Id</u>. PMI is obliged to prove, therefore, that what <u>almost invariably does not exist</u> in the mind of consumers <u>exists</u> in this case:  that the design of the Stanley bottle serves primarily to identify the bottle as coming from a single source rather than to make it more useful or more appealing.  Worse for PMI, it must do so with a product far less distinctive than a cocktail shaker shaped like a penguin.

The courts have repeatedly explained the reason for their extreme caution in product configuration claims under the Lanham Act:

DEFENDANT'S TRIAL BRIEF - 16
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

> While most trademarks only create a monopoly in a word, a phrase, or a symbol, "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves."

Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir. 2000) (quoting Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 380 (2d Cir. 1997)).  Courts have recognized that product design trade dress claims "raise a patent risk that relief will impermissibly afford a level of protection that would hamper efforts to market competitive goods" and risks "undermin[ing] restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas." Id. (quotations omitted).

In this climate of caution and skepticism as to the secondary meaning of product designs,[2] PMI comes forward with the scantest evidence of secondary meaning.  PMI offers no direct testimony of buyers as to their belief that the Stanley bottle has secondary meaning. Instead, the only direct evidence it offers is the Hebert Survey, a survey that fails to answer the question that must be answered to establish secondary meaning: is the trade dress uniquely associated with a specific source.[3]  See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 766 n.4 (1992) ("Secondary meaning is used generally to indicate that a mark or dress has come through use to be uniquely associated with a specific source." (emphasis added;

---

[2] See also TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 29 (2001) ("[I]n Wal-Mart we were careful to caution against misuse or overextension of trade dress."); Duraco Prods., Inc. v. Joy Plastic Enters., 40 F.3d 1431, 1453 (3d Cir. 1994) ("[S]econdary meaning in a product configuration case will generally not be easy to establish."); and Boston Beer Co. v. Slesar Bros. Brewing Co., 9 F.3d 175, 181 (1st Cir. 1993) ("Proof of secondary meaning entails vigorous evidentiary requirements.")

[3] In order to find that the claimed trade dress has acquired secondary meaning, PMI must prove that a significant number of the consuming public associates the trade dress with a single specific source.  Courts consistently demand that a "significant number of the consuming public" be shown to be at least 50% of that population.  McCarthy on Trademarks, § 32:190; Vision Sports v. Melville, 888 F.2d 609, 615 (9th Cir. 1989) (81% of survey respondents identify logo apart from word mark indicates logo's secondary meaning); STX, Inc. v. Trik Stik, Inc., 708 F. Supp. 1551, 1559 (N.D. Cal. 1988) ("Traditionally, percentages above 50% have constituted evidence of significant association.").

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

quotation omitted)); <u>Clicks Billiards, Inc. v. Sixshooters, Inc.</u>, 251 F.3d 1252, 1262 (9th Cir. 2001) ("The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a <u>particular</u> source." (quoting <u>Fuddruckers, Inc. v. Doc's B.R. Others, Inc.</u>, 826 F.2d 837, 843 (9th Cir. 1987) (emphasis added)).

The Hebert Survey, in addition to numerous methodological errors, asks only whether participants associate the pictured Stanley Classic Tall with "one company" or "more than one company." It never asks any question to establish whether survey participants associate the appearance with a <u>particular</u> single company (as the law requires for secondary meaning to attach) or whether instead they associate it with a number of <u>different</u> single companies (indicating <u>no</u> secondary meaning). PMI has repeatedly taken the mistaken position that the "anonymous source rule" excuses Hebert, as well as PMI, from proving anything more than that consumers associate the appearance of PMI's product with "one company."

That error permeates PMI's analysis of this case and will, if left uncorrected, mislead the jury. The Supreme Court, the Ninth Circuit Court of Appeals, and court after court in the United States has spoken plainly: secondary meaning requires proof of an association that is "unique" and that leads to a "particular" or "specific" single source. <u>See</u>, <u>e.g.</u>, <u>Two Pesos</u>, 505 U.S. at 766 n.4; <u>Clicks Billiards</u>, 251 F.3d at 1262; <u>Fuddruckers</u>, 826 F.2d at 843. The "anonymous source" rule that PMI has so often used for shelter does not overcome the obligation to prove that unique and specific association, it simply excuses the buyer from having to "know the corporate or personal name of the source." <u>McCarthy on Trademarks</u>, § 15:8 at 15-16—15-17.[4]

---

[4] The anonymous source rule excuses the survey respondent from needing to name the single source but it does not excuse Hebert or PMI from demonstrating that the association is with a unique, particular source. Even if PMI could claim that PMI, Stanley and Aladdin are poorly recognized or unknown corporate or trade names (a claim not yet made), PMI would still need to prove the unique association of the trade dress with just one specific, albeit anonymous, source. One responsible surveyor convinced the courts to accept his survey by identifying the source by characteristics other than the name. <u>See</u> <u>President and Trustees of Colby College v.</u>

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    Significantly, despite the number of times this issue has been briefed,[5] PMI has never

2    explained why the "anonymous source" provision swamps (or somehow satisfies) the

3    threshold duty to show consumers' unique association with a single, specific source.  Just so,

4    PMI has never responsibly confronted the cases cited by Thermos, including <u>Lund</u>, a case that

5    meticulously analyzed why a survey that failed to determine what was behind the "one

6    company" response is a misleading survey.[6]

7        And Mr. Hebert's survey is misleading.  After Mr. Hebert asked respondents whether

8    they associated the pictured bottle with "one company" or "more than one company," he

9    properly made no attempt to include those that responded "more than one company" among

10   those that, in his view, established secondary meaning in the design of the bottle.  Those

11   people obviously did not believe that the bottle was uniquely associated with a single specific

12   source.  But Hebert improperly failed to probe for clarity from those that responded "one

13   company."  If he had, he may have discovered that <u>more than one company</u> was represented

14   among the respondents that Hebert claims uniquely associate the bottle with a single source.

15   Those that answered one company may have gone on to indicate a variety of sources that

16   respondents believed were associated with the pictured bottle.  Importantly, the evidence at

17   trial will show that Mr. Herbert knew from his own pre-litigation survey research that a

18   follow-up question would in fact splinter the one-company responses.

19       In addition, under PMI's theory, it would be meaningless if Hebert's litigation survey

20   showed that rather than a unique association with a single specific source, the association was

21

22   _____

     <u>Colby College of New Hampshire</u>, 508 F.2d 804, 809 (1st Cir. 1975).

23   [5] This issue was argued in Defendant Thermos L.L.C.'s Motion in Limine #4 to Exclude

24   Expert Report and Testimony of James D. Hebert, as well as Plaintiffs' Motions in Limine
     (Sections I and II).

25   [6] PMI's only attempts to deal with <u>Lund</u> failed on a misreading of the facts set forth in that

26   opinion.  See Defendant's Reply in Support of its Motion in Limine No. 4 to Exclude Expert
     Report and Testimony of James D. Hebert at p.2 n.4.

DEFENDANT'S TRIAL BRIEF - 19
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

with more than one company.   Indeed, in PMI's view, it wouldn't matter if the 300 respondents that told Mr. Hebert that they associated the bottle with "one company" would have identified 300 different companies as the source.  PMI insists that secondary meaning was established merely when those respondents said "one company."   That view is simply wrong. [7]

Mr. Herbert's survey is also incurably deficient because it does nothing to tell the Court or the jury <u>why</u> they associate the Stanley bottle with "one company."   If an association is made not because of PMI's claimed trade dress but because of something else (<u>e.g.</u>, "all insulated come from one company"), no secondary meaning is proven.   And no secondary meaning is proven if the respondent picked "one company" but had <u>no</u> reason for the association.   Because the Herbert survey restricted respondents only to trade dress related

_____

[7] As explained in the text above, neither Hebert nor PMI have come to grips with their obligation to show that the trade dress is uniquely associated with a specific source.   The treatises and cases consistently reject the claim that secondary meaning is proven simply by finding enough people that answer "one company."   <u>See</u> Phyllis J. Welter, <u>Trademark Surveys</u>, §23.02[1][b] at 23-11 (1998) ("The idea that one can merely ask if something is from one company or more than one company . . . is not a workable idea due to the complexities of marketing and the law.").   As explained in <u>Sunbeam Corp. v. Equity Industries Corp.</u>, 635 F. Supp. 625, 631-32 (E.D. Va. 1986), questions such as Hebert's question 7 are easily misinterpreted "as asking whether the respondent thinks one company or more than one company makes the particular [product] they were viewing" rather than whether the appearance of the product is associated with just one source.   Most manufactured products are made by just one company.   The "natural answer" to the one company or more than one company question is one company so that "it is of little, if any, value to the Court's secondary meaning analysis."   Although Mr. Hebert's question offered respondents the chance to say that they "don't know" whether the trade dress was associated with one company or more than one company, he failed to give them the obvious choice that they associated the appearance of the bottle with <u>no</u> company.   <u>See</u> <u>Pebble Beach Co. v. Laub America Corp.</u>, No. C-84-20125, 1985 WL 5584, at *16 (N.D. Cal. Dec. 27, 1985).   As between Hebert's one company or more than one company choice, purely random responses would have produced a legally-sufficient 50% showing of secondary meaning, even though the evidence indicates that an open-ended follow-up question would have <u>disproved</u> secondary meaning.   <u>See</u> <u>id.</u> at *17; <u>see also</u> <u>Universal Frozen Foods Co. v. Lamb-Wesson, Inc.</u>, 697 F. Supp. 389, 394 (D. Or. 1987) ("'one company' or 'more than one company'" emphasis was "inappropriate in a secondary meaning survey").

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   issues, it fails to discover what association exists (even with "one company," whatever that

2   company might be) for non-trade-dress reasons.  This flaw in Herbert's survey was explained

3   in Thermos's Motion in Limine No. 4 and need not be repeated here.  However, a related

4   issue, the significance of the green color of the bottle to PMI's secondary meaning claim,

5   deserves further discussion.

6        The color green must be acknowledged to be a central (if not the central) feature of the

7   design of the Stanley bottle.  Before this litigation Mr. Herbert used only one non-brand

8   adjective to describe the Stanley bottle:  green.  He failed to include that characteristic,

9   however, in his checklist of permissible answers, thus steering respondents away from that

10  principal element of the design.

11       But it is not just the impermissibly misleading nature of Herbert's question 8 that

12  makes PMI unable to prove secondary meaning.  It is also that PMI cannot prove that it has

13  established secondary meaning apart from the color green.

14       "The inquiry into distinctiveness turns on the total appearance of the product . . . ."

15  I.P. Lund ApS v. Kohler Co., 163 F.3d 27, 39 (1st Cir. 1998).  The "total appearance" of the

16  Stanley bottle includes the obvious and prominent use of the color green.  At the same time, to

17  sustain its claim to secondary meaning, PMI must prove "that its claimed dress serves a

18  source-identifying role."  Clicks Billiards, 251 F.3d at 1258 (emphasis added).  PMI's claimed

19  dress meticulously avoids the color green.  Because the overall appearance of the bottle

20  includes a readily visible color while the claimed dress purposefully avoids that color, PMI

21  must prove that the claimed elements of the product are those that identify the source while

22  the green color plays no role in indicating the source.

23       PMI has not – and cannot – show that green is irrelevant to its trade dress.  Nor can it

24  show that secondary meaning can be proved in elements apart from the color green.  Because

25  the color green is inextricably tied to the total appearance of the Stanley bottle, it is

26  inextricably tied to PMI's evidence of secondary meaning.  PMI has sold the Stanley Classic

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

bottle <u>only</u> in green and its predecessor, Aladdin, rarely sold the bottle in any color other than green.  Repeatedly before this litigation, PMI and its agents (as well as Aladdin and its agents) regularly mentioned the color of its bottle.[8]  PMI's president and founder, Robert Harris, in announcing his purchase of the Stanley bottle selected "green" as the adjective that first describes the bottle:  "Americans trust the 'green bottle' because of its renowned durability, heat retention performance and lifetime guarantee."  <u>See</u> Thermos Trial Exhibit 35.  The color photo that Herbert used in his survey therefore also displayed the green color of the bottle.  Where, as here, a portion of the appearance of the product is obvious and prominent so that its role in any secondary meaning cannot be discounted, no secondary meaning can be found unless that portion is demonstrated to be immaterial to source identification.

And where, as here, the commonly used or obvious description of a product's appearance <u>varies</u> from the definition of the trade dress used in litigation, this courts may reasonably demand specific proof that the <u>litigation</u> description and not the <u>pre-litigation</u>, real world description accurately describes the trade dress.  In <u>Farberware Inc. v. Mr. Coffee, Inc.</u>, 740 F. Supp. 291 (D. Del. 1990), Farberware accused Mr. Coffee of trade dress infringement.  Farberware claimed rights to a particular configuration for its MicroBrew coffee maker that included a black color with contrasting white lettering.  Looking at the product itself, and referring to Farberware's and others' pre-litigation descriptions of the product, the Court immediately noted Farberware's litigation <u>mis</u>description:

> At the outset, the Court notes that while Mr. Coffee's product *is*, as alleged by Farberware, matte black with contrasting white lettering, the Farberware MicroBrew is a *three-color* product.  In other words, although Farberware's description of its MicroBrew trade dress would lead one to conclude otherwise, the MicroBrew is not adorned in merely black and white.  The MicroBrew also contains red ornamentation.

---

[8] For a fuller explanation of the perception that green is central to the design of the Stanley bottle, see the testimony and exhibits cited in Thermos's Motion in Limine #4 at p.9 and n.6, as well as Thermos's Reply brief at p.3 n.5.

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   Id. at 297 (emphasis in original, internal citation omitted).

2       Using a litigation trade dress description that strayed from the visible, real world

3   appearance of the product drew harsh criticism from the Court:

> 4       Farberware's description of its MicroBrew trade dress is, at
> 5   best, disingenuous.  At worst, the claimed trade dress could be
>     fairly characterized as specifically contrived to fit Farberware's
> 6   needs in this litigation.  There is only one explanation for why
>     Farberware framed its claim for trade dress protection in this
> 7   case so as to exclude MicroBrew's prominent red accents:  Mr.
>     Coffee's Quick Brew does not contain any red elements.

8   Id. at 298.  Similarly, there is only one explanation for why PMI framed its claim for trade

9   dress protection so as to exclude the prominent green color of the Stanley Classic bottle:

10  Thermos Work Series bottle is blue.  As was the plaintiff's trade dress description in

11  Farberware, PMI's trade dress description is improperly contrived to fit its needs in this

12  litigation.  However, despite the contrivance, the green color of PMI's bottle cannot be

13  ignored, and because PMI is unable to prove that green is immaterial to any claim of

14  secondary meaning, that claim must fail.

15      Due to the deficiencies in Mr. Herbert's survey, PMI is likely to attempt to prove

16  secondary meaning with circumstantial evidence:  advertising, sales success, length of use,

17  actual confusion and Thermos's purported "copying."  None of those can come close to

18  proving secondary meaning in the Stanley bottle.

19      1.    Image or "Look For" Advertising.

20
21  First Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378 (9th Cir. 1987), is the leading

22  case defining the role of sales, advertising and promotional activities in the proof of secondary

23  meaning.  As explained in that case, evidence of sales, advertising and promotional activities

24  may be relevant in determining whether a trade dress has acquired a secondary meaning.  Id.

25  at 1383.  "However, the advertising and promotional activities must involve 'image

26  advertising,' that is, the ads must feature in some way the trade dress itself."  Id.; see also

DEFENDANT'S TRIAL BRIEF - 23
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

<u>Yankee Candle Co. v. Bridgewater Candle Co.</u>, 99 F. Supp. 2d 140, 154 (D. Mass. 2000), <u>aff'd on point</u>, 259 F.3d 25 (1st Cir. 2001) (secondary meaning in trade dress is not created by advertising which does not specifically call attention to that trade dress).

Only advertising that urges consumers to "look for" the trade dress is to be considered in the secondary meaning analysis, because "[o]therwise, even evidence of extensive advertising or other promotional efforts would not necessarily indicate that prospective buyers would associate the trade dress with a particular source." <u>First Brands</u>, 809 F.2d at 1383. Thus, "a large expenditure of money does not in itself create legally protectable rights." <u>Carter-Wallace, Inc. v. Proctor & Gamble Co.</u>, 434 F.2d 794, 800 (9th Cir. 1970). Rather, the "test of secondary meaning is the effectiveness of the effort" to create secondary meaning through image advertising. <u>Id.</u> at 802; <u>see also</u> <u>Int'l Jensen v. Metrosound USA</u>, 4 F.3d 819, 824-25 (9th Cir. 1993).

In <u>First Brands</u>, the Ninth Circuit agreed with the district court's rejection of Carbide's claim to secondary meaning in a yellow jug with a particular shape:

> Prior to the hearing before the district court, Carbide did not attempt to engender consumer identification with the yellow F-style jug. It did not, for example, urge consumers to look for the "familiar yellow jug."

<u>First Brands</u>, 809 F.2d at 1383.

Accordingly, advertising and promotion that merely picture the product without calling attention to the particular trade dress fails to suggest secondary meaning. <u>Sassafras Enterprises, Inc. v. Roshco, Inc.</u>, 915 F. Supp. 1, 9 (N.D. Ill. 1996) ("Secondary meaning cannot be established by advertising that merely pictures the product and does nothing to emphasize the mark or dress."). Moreover, advertising that fails to isolate the trade dress, but promotes the dress in combination with other elements, cannot be used to establish secondary meaning. <u>Pfizer Inc. v. Astra Pharm. Prods., Inc.</u>, 858 F. Supp. 1305, 1320-21 (S.D.N.Y. 1994) (advertising of compound mark PROCARDIA XL is not probative of secondary meaning

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  for the element XL alone).  PMI's advertising regularly promotes the toughness and durability

2  of the Stanley bottle, thus defeating any role advertising could have in establishing secondary

3  meaning.  See I.P. Lund Trading Sp.S v. Kohler Co., 118 F. Supp. 2d 92, 112 (D. Mass. 2000)

4  (no secondary meaning where plaintiff's advertising promoted the esthetically pleasing and

5  utilitarian features of the trade dress rather than promoting it as a brand identifier).

6       Notably, PMI's efforts to prove secondary meaning are thwarted by its own shifting,

7  tangled and contrived trade dress definition in this case.  It is impossible to say that the trade

8  dress of the Stanley bottle has been consistently and effectively advertised when PMI's

9  lawyers even now continue to struggle to settle on a stable definition of that trade dress.

10  Moreover, the elements of PMI's trade dress that have remained constant at least in the case

11  have not been the subject of PMI's advertising.  Thermos knows of no "look for the base of

12  constant diameter" ads, or "crinkled finish means Stanley" promotions.  See Pebble Beach

13  Co. v. Tour 18 I, Ltd., 942 F. Supp. 1513, 1559 (S.D. Tex. 1996) aff'd as modified, 155 F. 3d

14  526 (5th Cir. 1998) (even extensive advertising that does not use the claimed trade dress fails

15  to show secondary meaning); Storck USA, L.P. v. Farley Candy Co., 797 F. Supp. 1399, 1411

16  (N.D. Ill. 1992) (promotional emphasis on one element of the product's trade dress rather than

17  on the claimed combination of elements that is the claimed trade dress, fails to show

18  secondary meaning in the combination); In re American Nat'l Can Co., 41 U.S.P.Q. 2d 1841,

19  1845 (TTAB 1997) ("Absent from applicant's advertising is any promotion of fluting [the

20  claimed trade dress] as an indication of the source of its beverage container.")

21       Finally, and significantly, PMI's use of advertising and promotional material to prove

22  secondary meaning is constrained, if not defeated, by its conscious efforts to separate its

23  claimed trade dress from the green color of the Stanley bottle.  To use image advertising to

24  prove secondary meaning PMI would need to demonstrate that it promoted the trade dress in a

25  way that did not promote the color of the product.

26

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

2.      Use of the Trade Dress to Increase Sales.

PMI may attempt to prove secondary meaning by showing that it or its predecessors have successfully used the claimed trade dress to increase sales of the Stanley bottle.  As with image advertising, the question is whether the trade dress has successfully been used to increase sales of the bottle, not just whether sales have increased (if they have).  Increased sales not shown to be driven by the claimed trade dress do not indicate secondary meaning. As explained in Continental Lab. Prods., Inc. v. Medax Int'l, Inc., 114 F. Supp. 2d 992, 1002-03 (S.D. Cal. 2000):

It is well-established that evidence of a product's success in the marketplace does not necessarily show that its design has secondary meaning:

Sales success by itself will typically not be as probative of secondary meaning in a product configuration case as in a trademark case, since the product's market success may well be attributable to the desirability of the product configuration rather than the source-designation capacity of the supposedly distinguishing feature or combination of features.  And unlike with a trademark, where repeated purchases of a product support an inference that consumers have associated the mark with the producer or source, one can much less confidently presume that a consumer's repeated purchase of a product has created an association between a particular product configuration and the source.

Id. (quoting Duraco Prods., Inc. v. Joy Plastic Enterprises Ltd. 40 F.3d 1431, 1452-53 (3d Cir. 1994)).  See also Cicena Ltd. v. Columbia Telecomm. Group, 900 F.2d 1546, 1551 (Fed. Cir. 1990) ("[S]ales success is not necessarily indicative of secondary meaning, but can be attributed to many other factors . . . .); Aromatique Inc. v. Gold Seal, Inc., 28 F.3d 863, 873 (8th Cir. 1994) ("Because the proper inquiring is whether the evidence demonstrates that the purchasing public identifies the asserted mark with the source of the product, sales figures alone are inadequate to establish a connection between a product and its source."); Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d 1342, 1345 (C.C.P.A. 1977) (evidence of sales

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

"may have relevance in establishing secondary meaning [but is] not necessarily indicative of recognition of the mark by purchasers as an indication of source of the goods."); McCarthy on Trademarks and Unfair Competition, § 15.47 at 15-67 ("Popularity of a product is not synonymous with secondary meaning.  Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark.")

### 3. Extent of Exclusive Use.

PMI may maintain that its use of the trade dress has been exclusive and unchanged for many years.  A review of PMI's exhibits suggests that there have been changes in the bottle but that the green color - the element that PMI eschews - has been constant.  Still, even long periods of exclusive use of a clearly defined protectable trade dress that does not result in a unique association with a single specific source in the minds of the consuming public fails to establish secondary meaning.  As explained in the important Continental Laboratory case:

> There is no talismanic number of months or years that establishes when an unregistered trademark or trade dress can obtain secondary meaning.  Length of time "is merely one additional piece of evidence to be weighed with all others in determining the existence of secondary meaning." McCarthy § 15.53 at 15-77.  "After all, a party's time and exclusivity of use merely provide the opportunity to build source identification in the public mind." Sassafras Enters. Inc. v. Roshco, Inc., 915 F. Supp. 1, 9 (N.D. Ill. 1996).  *Whether secondary meaning attaches after a period of exclusive use depends on how, rather than how long, the plaintiff used its mark or design.*

Continental Lab., 114 F. Supp. 2d at 1004 (emphasis added).  In Keebler Co. v. Rovira Biscuit Corp., 624 F.2d 366, 378 (1st Cir. 1980), therefore, the Court held that there was no secondary meaning in a green cylindrical can despite 40 years of exclusive use.[9]  Nothing in the time the Stanley bottle has been on the market indicates that it has acquired secondary

---

[9]  Interestingly, the Court also held that the defendant had taken "reasonable steps" to distinguish its product from Keebler's green cylindrical bottle by adopting a blue color and by prominently displaying its own logo.

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  meaning.

2                 4.      <u>Actual Confusion</u>

3        The only evidence of actual confusion that relates to the claimed trade dress is the

4  handful of survey respondents in Dr. Philip Johnson's survey, commissioned by Thermos,

5  that indicated that the Thermos Work Series Beverage bottle was from Stanley.  It is clear that

6  survey data evidence in a likelihood of confusion survey is <u>not</u> actual confusion.  No less than

7  the leading commentator on trademarks has unequivocally stated: "Surveys do not measure

8  the degree of actual confusion by real consumers making mistaken purchases."  <u>McCarthy on</u>

9  <u>Trademarks</u> § 32:184.  One court called that conclusion "obvious."  <u>Malletier v. Dooney &</u>

10  <u>Bouke</u>, 340 F. Supp. 415, 433 (S.D.N.Y. 2004).  Nonetheless, PMI successfully convinced

11  this Court that it was right and Professor McCarthy was wrong in PMI's Motion in Limine

12  No. 2.[10]  While it is expected that this error can be corrected at trial or through the testimony

13  of Dr. Johnson himself, if it is not it threatens to mislead and profoundly confuse the jury.

14                 5.      <u>Intentional Copying.</u>

15        PMI places great weight on its claim that Thermos deliberately copies the Stanley

16  bottle.  The threshold problem PMI will have is proving that Thermos copied PMI's trade

17  dress. Thermos denies copying.  What Thermos did instead of copying was target the market

18  where the Stanley bottle was leading Thermos's competing products and offer a product that

19  captured that market's demand but was distinct, particularly in that it was <u>better</u> than the

20  Stanley bottle.[11]

21        Even if PMI could prove that Thermos deliberately copied the Stanley bottle, PMI

22  misunderstands the law related to such copying in this case.  The pivotal flaw in PMI's

23

24  _____

  [10] Thermos respectfully requests the Court to revisit the briefing in this issue.

25  [11] Even when a product is copied, improvements in the copy counter any inference of

26  secondary meaning.  <u>Universal Frozen Foods Co. v. Lamb-Weston Inc.</u>, 7 U.S.P.Q.2d 1856, 1859 (D. Or. 1987).

DEFENDANT'S TRIAL BRIEF - 28
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  analysis is its failure to recognize that there are unique policy considerations in product design

2  trade dress cases that make it difficult or impossible to apply principles developed in word

3  mark, packaging or restaurant décor cases.  Here again, Thermos urges the Court's attention

4  to the Continental Laboratory case.  There Judge Whelan synthesized the  cases that had

5  indicated that copying sometimes suggest secondary meaning with those that recognize and

6  applaud the competitive benefits of copying product configurations or designs.  114 F. Supp.

7  2d at 1008-13.  The court thoughtfully explained how the assumptions necessarily made when

8  copying is allowed to suggest secondary meaning are simply inapplicable in product design

9  cases.  Id. at 1009.  Just as in Continental Laboratory, this Court should not permit copying to

10  play any role in the determination of secondary meaning.

11      At the very least, PMI should be obliged to prove that Thermos had the intention to

12  pass off its Work Series Beverage bottle as the Stanley bottle.  Though Judge Whelan refused

13  to allow the acknowledged copying of a product design to suggest secondary meaning in any

14  way, he explained that some courts have considered copying if there was a demonstrated

15  intent to confuse consumers:

16        Many courts have refused to infer secondary meaning from
        mere intentional copying.  Instead, intentional copying supports
17        a finding of secondary meaning only where the defendant
        intended to confuse consumers and pass off its products as the
18        plaintiff's.

19  Id. at 1010, citing Thomas & Betts Corp. v. Panduit Corp., 65 F. 3d 654, 663 (7th Cir. 1995);

20  Blau Plumbing v. S.O.S. Fix-It, Inc., 781 F.2d 604, 611 (7th Cir. 1986); and Chrysler Corp. v.

21  Vanzant, 44 F. Supp. 2d 1062, 1083 (C.D. Cal. 1999).

22      In accord with that principle, many courts have refused to infer secondary meaning

23  from intentional copying of a product design if the defendant made deliberate efforts to

24  prevent source confusion such as by using different packaging or displaying its own

25  trademark.  See Continental Laboratory, 114 F. Supp. at 1010 n.14; Aromatique, Inc. v. Gold

26

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   Seal, Inc., 28 F.3d 863, 871 (8th Cir. 1994), Remco Indus., Inc. v. Toyomenka, Inc., 286 F.

2   Supp. 948, 955 (S.D.N.Y.), aff'd 379 F.2d 977 (2d Cir. 1968).  Because Thermos's packaging

3   is very different than PMI's, and because of the other ways its bottle is distinguishable from

4   PMI's (Thermos's is blue and PMI's is green), no suggestion of secondary meaning exists,

5   even if PMI first proves Thermos's intentional copying of the Stanley bottle.

6   PMI will be unable to carry its burden to prove that the Stanley bottle has acquired

7   secondary meaning.

8   **E.      PMI Cannot Establish a Likelihood of Confusion**

9   Likelihood of confusion is "the core element of trademark infringement."  Int'l Jensen

10   v. Metrosound U.S.A., Inc., 4 F.3d 819, 825 (9th Cir. 1993).  To establish likelihood of

11   confusion, PMI must prove that the overall appearance of the Thermos Work Series bottle is

12   likely to cause confusion among an appreciable number of actual or potential purchasers as to

13   the source of the Thermos Work Bottle because of the similarities between the claimed trade

14   dress rights in the Stanley Bottle (assuming the claimed dress is protectable) and Thermos's

15   bottle.  Id.; Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1151 (9th Cir. 2002); First

16   Brands Corp. v. Fred Meyer, Inc., 809 F.2d 1378, 1383-84 (9th Cir. 1987); Avery Denison

17   Corp. v. Acco Brands, Inc., No. 99-1877, 1999 WL 33117261, at *18 (C.D. Cal. Oct. 12,

18   1999).  Likelihood of confusion is synonymous with "probable" confusion.  Murray v. Cable

19   Nat'l Broadcasting Co., 86 F.3d 858, 861 (9th Cir. 1996).  It is not sufficient if confusion is

20   merely "possible."  Id.

21   Dr. Philip Johnson, a recognized and experienced, survey research expert conducted a

22   likelihood of confusion survey at the request of Thermos in this case.  Dr. Johnson used the

23   traditional and judicially approved "Eveready" survey format to determine whether there was

24   a likelihood of confusion between the Thermos Work Series Beverage Bottle and the Stanley

25   bottle.  He conducted his research consistent with the methods for survey research that have

26

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  been demanded by courts and commentators alike, including those in the <u>Manual for Complex</u>

2  <u>Litigation, Third</u> § 21.493 (1995); <u>see</u> <u>McCarthy on Trademarks</u> § 32:181 at 32-272.  Personal

3  interviews were conducted with 400 consumers in 12 different markets throughout the United

4  States.  Based on that survey, he concludes that it is clear that there is no significant level of

5  confusion between the Thermos Work Series Beverage Bottle and the Stanley bottle.

6  PMI failed to produce a likelihood of confusion survey, although its written discovery

7  responses stated that one was underway.  In addition, PMI's survey expert testified in his

8  deposition that he had done many likelihood of confusion surveys, but was not asked to

9  conduct one in this case.  There is an overwhelmingly strong inference from PMI's failure to

10  produce a survey that it knew the results would be unfavorable if one were performed.

11  The relevant <u>Sleekcraft</u> factors favor Thermos:

12  1.  <u>Strength or Weakness of the Claimed Trade Dress.</u>

13  As discussed in the sections of this brief addressing functionality, genericness and

14  secondary meaning, PMI's claimed trade dress rights in the Stanley bottle (if they exist at all)

15  are weak and exceedingly limited.  This factor weighs in favor of Thermos.

16  2.  <u>The Proximity of the Goods.</u>

17  The goods in this case are, of course, competing vacuum bottles and therefore in

18  proximity to each other.  This factor must not be given undue weight, however, because the

19  competitors' goods are therefore in proximity to each other whenever competitors are

20  involved in trademark or trade dress infringement litigation.

21  3.  <u>Similarities and Differences Between the Goods and Their Packaging.</u>

22  There are substantial differences in the appearance of the Thermos and Stanley bottles,

23  including their notably different colors – a particularly significant factor given the history of

24  the green Stanley bottle.   In addition, the THERMOS® trademark is used prominently on

25  both the bottles themselves and on their packaging, which also calls out the improvements to

26

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the Thermos bottle that further differentiates it from the Stanley bottle.  This factor weighs in Thermos's favor.

### 4.    Actual Confusion.

PMI produced no evidence of actual confusion among consumers during discovery. This factor therefore also favors Thermos.

### 5.    Intent to Confuse.

A defendant's intent in a product design trade dress case is relevant to likelihood of confusion only if the defendant intended to cause consumer confusion as to the source of the product. See Versa Prods. Co., Inc. v. Bifold (Mfg.) Ltd., 50 F.3d 189, 207-209 (3d Cir. 1995).   There is a distinction between a deliberate attempt to deceive and confuse as to the source of a product, and a deliberate attempt to compete effectively in the marketplace.  If a defendant copies a plaintiff's product design because it sells better and consumers seem to like it, this is not evidence of an intent to confuse.  Libman Co. v. Vining Indus., Inc., 69 F.3d 1360, 1363 (7th Cir. 1995); McCarthy on Trademarks § 8:19.  There is plainly no evidence of an intent to confuse here.  Rather, Thermos's prominent display of its own  THERMOS® trademark on the bottle and its packaging demonstrates that Thermos intended to compete by introducing a superior bottle that it wanted consumers to understand came from Thermos.

Further, although Thermos had every right to copy the unpatented Stanley bottle, the evidence at trial will show that it did not do so. It instead incorporated certain features of the Stanley bottle because those features are functional and/or because focus group research showed that consumers wanted them.  Rather than copy the Stanley bottle, Thermos went to great lengths to introduce a better bottle.  Thermos further differentiated its Work Series bottle from the Stanley bottle by its own distinct packaging and prominent labeling with the THERMOS® trademark.

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1

6.      Marketing/Advertising Channels.

2

The bottles are, of course, sometimes sold in the same stores and advertised in similar

3

media.  Like the proximity of the goods, however, this is not a factor to be weighted heavily

4

given the other product specific factors that so heavily favor Thermos.

5

7.      Purchaser's Degree of Care.

6

Although the bottles are not expensive items such as automobiles or major home

7

appliances, the purchasers of the bottles also are not impulse buyers. The evidence at trial will

8

show that purchasers exercise a reasonable degree of care and attention when purchasing a

9

vacuum bottle, particularly in the blue collar trades market.

10

8.      Product Labeling.

11

The prominent labeling of the THERMOS® and STANELY marks on the bottles and

12

their packaging means that this factor strongly favors Thermos.

13

Although evidence of post-sale confusion may be considered as part of the likelihood

14

of confusion determination, courts have cautioned that post-sale confusion is not reliable

15

generally not as relevant as point-of-sale-confusion to the likelihood of confusion analysis.

16

See Plasticolor Molded Prods. v. Ford Motor Co., 713 F. Supp. 1329, 1336 n.8 (C.D. Cal.

17

1989) (Kozinski, J.), vacated by consent, 767 F. Supp. 1036 (C.D. Cal. 1991) ("While point-

18

of-sale and post-sale confusion are both considered in determining whether there has been

19

trademark infringement, the two are not equivalent in significance.  Point-of-sale confusion is

20

by far the more important, because it directly affects individuals who are in the market for the

21

particular product.  Post-sale confusion may affect future purchasers of the product, but in a

22

more indirect and diffuse manner; post-sale confusion is far less likely to cause erroneous

23

purchases than point-of-sale confusion."); Sturm, Ruger & Co. Inc. v. Arcadia Mach. & Tool

24

Inc., 10 U.S.P.Q. 2d 1522, 1529 (C.D. Cal. 1988) (categorizing post-sale confusion as a

25

"subsidiary factor[] contributing to likelihood of confusion").

26

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Moreover, post-sale confusion is established only if causally related to the allegedly infringing trade dress and only if post-sale observations will affect later purchasing decisions. See Reebok Int'l. Ltd. v. K-Mart Corp., 849 F. Supp. 252, 272-73 (S.D.N.Y.), vacated by consent, No. 92-8871, 1994 WL 733616 (S.D.N.Y. Dec. 28, 1994). Courts have also noted that the doctrine must be applied with caution because of the tendency to draw undue inferences about the likelihood of confusion in the post-sale context, as well as about the cause of post-sale confusion. Reebok Int'l Ltd. v. K-Mart Corp., 849 F. Supp. at 272-73 ("Even had [plaintiff] demonstrated a likelihood that an appreciable number of consumers would mistake [defendant's product for plaintiff's], a claim of post-sale confusion requires the additional steps of showing that the consumers will perceive something about the product, and that what they observe will affect a later purchasing decision. . . . In appropriate cases, these inferences are warranted . . . However, at some point unfounded inferences become too remote from the evidence to support a conclusion that confusion is likely. Courts must be particularly wary of wholly speculative claims in the context of post-sale confusion."); see also Smithkline Beckman Corp. v. Pennex Prods. Co., Inc., 605 F. Supp. 746, 752 (E.D. Pa. 1985) ("it is only that confusion which is the direct result of defendants' acts that concerns the law of unfair competition. The inquiry into the likelihood of confusion is directed towards the time of purchase. Post-purchase confusion which is not the direct consequence of defendants' action is not a factor.").

**F.     Aladdin Did Not Transfer to PMI the Claimed Trade Dress Rights Before This Lawsuit Was Filed**

PMI has asserted that it owns the trade dress rights asserted in this lawsuit. To own the trade dress rights, PMI must prove that it received a valid assignment of the entirety of Aladdin's trade dress rights in the Stanley bottle. The evidence will show that Aladdin did not assign such rights to PMI, at least as of the time that PMI filed this suit. Absent a valid assignment that transferred ownership of the asserted trade dress rights to PMI before this suit

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   was filed, PMI did not own the trade dress rights at the time of filing.  Absent ownership of

2   the trade dress rights as pled in its complaint, PMI has no standing to pursue this lawsuit.

3         In order for a plaintiff to have standing to file a lawsuit asserting infringement of trade

4   dress rights, it must have owned to the trade dress rights being asserted on the date of the

5   filing of the lawsuit.  <u>Gaia Tech., Inc. v. Reconversion Tech., Inc.</u>, 93 F.3d 774, 778, 780

6   (Fed. Cir. 1996); <u>Maupin v. Yamamoto</u>, No. CIV.A. 3:97CV00038, 2000 WL 1861830, at *2

7   (W.D. Va. Dec. 19, 2000).  A plaintiff that acquired its rights from another person or entity

8   must have done so through a valid assignment before the filing of the suit.  <u>Id</u>. at 779.  The

9   assignment of the trade dress to the plaintiff must also have included the goodwill in the

10   business associated with the trade dress.  <u>Mister Donut of America, Inc. v. Mr. Donut, Inc.</u>,

11   418 F.2d 838, 842 (9th Cir. 1969).

12         The evidence will show that PMI did not obtain a valid assignment of the trade dress

13   rights in the Stanley bottle and therefore had no standing to file this suit.  Although PMI and

14   Aladdin signed an Asset Purchase Agreement in December 2001 whereby Aladdin agreed to

15   assign a broad category of intellectual property rights to PMI, no such assignment occurred

16   before the filing of this lawsuit.  When the closing contemplated by the Asset Purchase

17   Agreement actually occurred on February 15, 2002, no assignment document was executed.

18   While a written assignment is not necessary to effectuate an assignment of unregistered trade

19   dress rights, there is no credible evidence that the parties assigned Aladdin's trade dress rights

20   in the Stanley bottle in any manner outside the closing documents.  Moreover, the nature of

21   the closing documents and the extent of the terms in those documents (including the express

22   inclusion of a list of "Excluded Assets" from the Bill of Sale) strongly suggest that PMI and

23   Aladdin intended that these documents were to reflect the parties' entire agreements at the

24   time of closing.  The parties' execution of amended documents <u>in August 2004</u>, more than

25   two years after the closing and well after the filing of this lawsuit, similarly indicates their

26   awareness that PMI lacked standing to file the lawsuit.  The execution of amended documents

DEFENDANT'S TRIAL BRIEF - 35
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

were a transparent (and unsuccessful) attempt to cure that problem.

The execution of an assignment after the filing of the lawsuit cannot confer standing on a plaintiff retroactively.  Gaia, 93 F.3d at 779-80.  It is well settled that a plaintiff must possess the right upon which it has filed suit at the time it files suit.  Id.

Nor does the Asset Purchase Agreement suffice to effectuate the assignment.  The evidence will show that the Asset Purchase Agreement was nothing more than an agreement to assign the trade dress rights at some future closing date, not a document that presently assigned the rights.  PMI and Aladdin obviously realized this when they tried to cure the standing problem with the later amendments.[12]

### G.    PMI's State Law Claims Also Fail

1.    Washington State Law Requires That PMI's State Law Claims Must Be Decided Under Federal Trade Dress Infringement Standards

PMI's claims under section 43(a) of the Lanham Act, the Washington State Consumer Protection Act (the "CPA"), and Washington's common law against unfair competition are all premised on the same underlying allegation that Thermos's Work Series bottle infringes the trade dress that PMI claims in its Stanley bottle.  See PMI's Second Amended Complaint for Trade Dress Infringement and Unfair Competition, ¶¶ 10-12; PMI's Amended Pretrial Order, ¶¶ 5-7.  As a matter of Washington state law, the analytical framework for deciding PMI's federal law claim as well as its state law claims is supplied by federal courts' interpretation of section 43(a) of the Lanham Act.

a.    PMI's Consumer Protection Act Claim Must Be Decided in Accordance With Federal Standards

Section 19.86.920 of the Washington Consumer Protection Act (the "CPA")

_____

[12] Although the Lanham Act requires only injury, rather than ownership, to confer standing on a plaintiff to file suit for trade dress infringement, here PMI has pled ownership.  Moreover, there is no evidence that PMI is a licensee with rights to sue for infringement or that PMI and Aladdin ever intended to transfer such rights.  Indeed, all indications are that the intention was to assign ownership of the trade dress to PMI.

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

specifically directs courts to use the precedent developed by federal courts as a guideline in interpreting the CPA:

> [T]he purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices . . . It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters . . . To this end this act shall be liberally construed that its beneficial purposes may be served.

RCWA § 19.86.920; see also State v. Black, 100 Wash. 2d 793, 799 (1984) (en banc) ("When the Legislature enacted the Consumer Protection Act, it anticipated that our courts would be guided by the interpretation given by federal courts to their corresponding federal statutes."); Blewett v. Abbott Labs., 86 Wash. App. 782, 788 (Div. 1 1997) (in directing courts to be "guided by" federal law, the Legislature intended thereby to avoid subjecting defendants to divergent regulatory approaches to the same conduct); see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp., 755 F.2d 158, 165 (Fed. Cir. 1985) (noting that the CPA "has been judicially recognized as indicating to state courts that they should be guided by the interpretation federal courts give to corresponding federal statutes.").

Accordingly, in analyzing and deciding claims brought under the CPA, Washington state courts have consistently relied on federal courts' interpretation of the corresponding federal statutes. See Blewett v. Abbott Labs., 86 Wash. App. at 787 ("in practice Washington courts have uniformly followed federal precedent in matters described under the Consumer Protection Act."); Ballo v. James S. Black Co., 39 Wash. App. 21, 26 (Div. 3 1984) (adopting test used by federal courts to determine whether conduct violates federal antitrust laws in order to determine whether alleged conduct violated CPA's antitrust provision); accord Ass'n of Washington Public Hosp. Districts v. Philip Morris Inc., 241 F.3d 696, 706 (9th Cir. 2001) (citing instruction in § 19.86.920 to interpret CPA in light of federal court decisions

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

interpreting corresponding federal law as basis for refusal to depart from federal antitrust proximate cause principles in analyzing proximate cause requirement under the CPA).

In particular, Washington state courts, along with the Ninth Circuit, look to federal courts' interpretation of section 43(a) of the Lanham Act as providing the framework for deciding CPA claims for trademark and trade name infringement. See Talking Rain Beverage Co. Inc. v. South Beach Beverage Co., 349 F.3d 601, 603 (9th Cir. 2003) ("To succeed on its trademark claims under the Lanham Act, [plaintiff] must meet three elements: nonfunctionality, (2) distinctiveness and (3) likelihood of confusion. . . . [Plaintiff's] state law claims [asserted under RCW § 19.86.020] also turn on whether it can establish these elements."); Nordstrom, Inc. v. Tampourlos, 107 Wash. 2d 735, 739 (1987) (analogizing Washington Consumer Protection Act to section 43(a) in support of finding that trade name infringement was an "unfair or deceptive act" in violation of RCW § 19.86.020); Tradewell Stores, Inc. v. T .B. & M., Inc., 7 Wash. App. 424, 431 (Div. 2 1972) (same).

                    b.     PMI's Claim for Common Law Unfair Competition Must Be Decided in Accordance With Federal Standards

This District looks to federal law to supply the analytical framework for deciding Washington common law unfair competition claims based on alleged trademark infringement. See Nat'l Football League Properties, Inc. v. Wichita Falls Sportswear, Inc., 532 F. Supp. 651, 655 n.1 (W.D. Wash. 1982) ("The right to relief, whether premised on federal registration, § 43(a) of the Lanham Act or state unfair competition law, is the same.  All relief is bottomed on a showing of likelihood of confusion"); Dr. Ing. H.c.F. Porsche AG v. Universal Brass, Inc., No. 94-792, 1995 WL 420816, at *5 (W.D. Wash. Feb. 23, 1995) (noting that likelihood of confusion of business entity test under Washington unfair competition law is essentially a [Lanham Act] likelihood of confusion as to source test); accord Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 902 n.2 (9th Cir. 2002) (noting that Ninth Circuit's likelihood-of-confusion test "also governs [plaintiff's] state law claims of

DEFENDANT'S TRIAL BRIEF - 38
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

unfair competition").

In particular, Washington courts addressing claims of unfair competition based on alleged infringement of a product configuration trade dress rely on federal cases and recognize the same limitations on the scope of such trade dress.  See Cedar-Al Products, Inc. v. Chamberlain, 38 Wash. App. 626, 627-28 (Div. 2 1984) (recognizing that "trade dress" does not encompass the functional features of a product; a competitor may copy all of the characteristics of a product except those features "that serve only to identify the product as coming from a particular source, i.e., the rival").  Courts addressing CPA claims based on alleged trade name infringement similarly look to federal law to determine the strength of plaintiff's purported trademark interest.  See Seattle Endeavors, Inc. v. Mastro, 868 P.2d 120, 124 (Wash. 1994).

2.    Federal Law Requires that PMI's State Law Claims Must Be Decided Under Federal Standards

Even if, arguendo, Washington statutory and common law unfair competition claims were not substantially congruent to trademark infringement claims under the Lanham Act, federal law precludes state statutory and decisional law from providing product configurations with broader protection than exists under federal law.  See Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 156 & 165 (1989) (states "may not offer patent-like protection to intellectual creations which would otherwise remain unprotected as a matter of federal law" but may "place limited regulations on the use of unpatented designs in order to prevent consumer confusion as to source"); Unital, Limited v. Sleepco Mfg., Ltd., 627 F. Supp. 285, 294 (W.D. Wash. 1985) ("Where federal law provides no legal protection for an unpatented, uncopyrighted, or unregistered article, a state may not prohibit copying of it or award damages for such copying.").[13]

---

[13]  Federal law does not, however, preclude Washington state law from providing *less* protection to PMI's product configuration than is provided under the Lanham Act.  Indeed, the CPA does just this in requiring the plaintiff to prove not just the underlying infringement

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    In Unital, as here, the plaintiff's claims for violation of the Lanham Act, violation of

2    the Washington Consumer Protection Act and common law unfair competition were all based

3    on the same allegation – viz., defendant's alleged copying of the roof contour of plaintiff's

4    sleeper cab for long-haul trucks.  The district court observed that, "[a]lthough the parties are

5    diverse and state law claims are made, the primary source of the rights sued upon is federal

6    law."  Id. at 288.  The court analyzed the plaintiff's claim under the Lanham Act and

7    determined that the plaintiff's roof design was functional and therefore not protected.  Id. at

8    289-91.  Based on that determination, the court further concluded that "there is no premise for

9    Unital's claims of unfair competition under state law."  Id.; accord Mountain Safety Research,

10   Inc. v. Coleman Outdoor Prods., Inc., 869 F. Supp. 818, 825 (W.D. Wash. 1993) (finding that

11   defendants were entitled to summary judgment on plaintiff's federal trademark infringement

12   claim and therefore dismissing plaintiff's state law claims related to trademark infringement).

13       **H.    PMI's Claims Are Barred By Laches**

14       Thermos has asserted that the equitable defense of laches bars PMI's claims.

15       The evidence at trial will show that Thermos manufactured, marketed and sold a

16   Thermos brand vacuum-insulated bottle known as Thermos Model 2695 for several years in

17   the early and mid-1990s.  The Thermos Model 2695 bottle not only contained all of the

18   elements of PMI's purported trade dress, but was much closer in appearance to the Stanley

19

20   allegation, but also that (i) the alleged infringement affected the public interest; and (ii) the act
     or practice alleged against the defendant was not reasonable.  See RCWA § 19.86.920 ("It is .

21   . . the intent of the legislature that [the CPA] shall not be construed to prohibit acts or
     practices which are reasonable in relation to the development and preservation of business . . .

22   ."); see also Travis v. Washington Horse Breeders Ass'n, Inc., 111 Wash. 2d 396, 408 (1988)
     (trial court erred in failing to instruct jury that CPA does not prohibit reasonable acts or

23   practices); Cox v. Lewiston Grain Growers, Inc., 86 Wash. App. 357, 374 (Div. 3 1997)
     ("Acts which bear a reasonable relationship to the development and preservation of business

24   are not CPA violations."); Seattle Endeavors, Inc. v. Mastro, 868 P.2d 120, 127 (Wash. 1994)
     (inadvertent infringement of weak mark fails to satisfy public interest element of CPA claim);

25   Nordstrom v. Tamporlous, 733 P.2d 208, 211-12 (Wash. 1987) ) (CPA requires that "private

26   plaintiffs make a showing of public interest.").

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

bottle than the Thermos Work Series bottle accused of infringement in this case.  Yet Aladdin, Thermos's primary vacuum bottle competitor in the early and mid- 1990's and the company from which PMI claims to have purchased the claimed trade dress rights in the Stanley bottle in 2002, never objected to the Model 2695 bottle.  Had Aladdin done so, Thermos would have been able to determine over a decade ago what rights Aladdin claimed, could have obtained a ruling regarding the issue, and would have been in a position to avoid the present dispute altogether.  Instead, Thermos did exactly what Aladdin's silence entitled it to do:  continue to design, manufacture and sell products incorporating the very features found in the Model 2695 bottle that form the basis of this lawsuit.  Now that Thermos has committed to a substantial investment in the manufacture and marketing of the Thermos Work Series bottle, PMI cannot overcome the failure of Aladdin to act more than a decade ago when it should have done so and force Thermos to relinquish its investment and right to make and sell the Work Series bottle.

"For laches to apply in a trademark infringement case, the defendant must show that the plaintiff had knowledge of the defendant's use of an allegedly infringing mark, and that the defendant would be prejudiced by allowing the plaintiff to assert its right at this time."  Chattanoga Mfg., Inc. v. Nike, Inc., 301 F.3d 789, 792-93 (7th Cir. 2002).  "[A] plaintiff must have actual or constructive notice of the defendant's activities."  Id. at 793 (emphasis added).  A trademark assignor's knowledge and conduct may be imputed to an assignee for laches purposes.  Borg-Warner v. York-Shipley, Inc., 293 F.2d 88, 94 (7th Cir. 1961).

"[A] delay prejudices a defendant when the assertion of a claim available for some time would be inequitable in light of the delay in bringing that claim and ensues when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed."  Id. at 795.  Commitment to an expensive advertising and marketing campaign can constitute the required prejudice.  See id.

A finding of laches will bar PMI's claims for both injunctive relief and damages.

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Grupo Gigante SA DE CV v. Dallo & Co., Inc., 391 F.3d 1088 (9th Cir. 2004) (affirming denial of injunctive relief and citing E-Systems, Inc. v. Monitek, Inc., 720 F.2d 604, 607 (9th Cir. 1983) regarding the six factors "for determining whether laches bars a claim for either damages or injunctive relief"); Prudential Ins. Co. v. Gibraltar Financial Corp., 694 F.2d 1150, 1152 (9th Cir. 1983) ("[t]he Supreme Court explicitly made laches available as an equitable defense barring injunctive relief in United Drug Co. v. Rectanus Co., 248 U.S. 90, 102-103 (1918) and French Republic v. Saratoga Vichy Spring Co., 191 U.S. 427, 436-437 (1903)." (parallel citations omitted)).

The evidence at trial will establish the applicability of a laches defense. Thus, damages and injunctive relief should be denied.

## I.      PMI Is Not Entitled to Monetary Recovery

The Lanham Act provides that, "subject to the principles of equity," a plaintiff who establishes a violation of 15 U.S.C § 1125(a) may recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C § 1117(a); Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993). A plaintiff's entitlement to damages, however, is not absolute. The Ninth Circuit has emphasized that "'[t]he equitable limitation upon the granting of monetary awards … would seem to make it clear that such a remedy should not be granted as a matter of right.'" Id. at 1404-05 (quoting Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 120 (9th Cir.). Rather, "[w]hen fashioning a remedy in a given case, the court must rely not merely on the legal conclusion of liability, but must also consider the nature of the infringing actions, including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party." Lindy Pen, 982 F.2d at 1405 (internal quotations omitted).

### 1.      Defendant's Profits.

Under Ninth Circuit law, a plaintiff may seek a disgorgement of the defendant's

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

profits under two alternative theories:  as an accounting, where the defendant engaged in willful infringement,[14] or as a surrogate for plaintiff's lost sales.  Id. at 1406-07; Adray v. Adray-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1995); Sugai Products, Inc. v. Kona Kai Farms, Inc., No. 97-00043, 1997 WL 824022, at *15 (D. Haw., Nov. 19, 1997).

Regardless of whether plaintiffs seek defendant's profits under a theory of an accounting for willful infringement or as a surrogate for their own lost profits, they bear the burden of establishing, with "reasonable certainty," defendant's gross profits from the infringing activity.  Lindy Pen, 982 F.2d at 1408.  Plaintiffs are not entitled to profits demonstrably not attributable to the unlawful use of their trade dress.  Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 124 (9th Cir. 1968).  See also Rolex Watch, U.S.A., Inc., v. Michel Co., 179 F.3d 704, 712 (9th Cir. 1999) (trial court properly denied plaintiff's request for defendant's profits where plaintiff did not adequately demonstrate what portion of defendant's sales were due to infringing activity) Lindy Pen, 982 F.2d at 1408 ("an accounting is intended to award profits only on sales that are attributable to the infringing conduct").  In Lindy Pen, the court rejected the plaintiff's claim for defendant's profits from sales that clearly were not the result of defendant's infringement.  There, the defendant, Bic Pen, was found to have infringed on plaintiff's trademark on the term, "Auditors," for its pens.  Id. at 1404.  The court found that there was a likelihood of confusion only in the telephone order market for pens, where consumers did not have the opportunity to inspect the parties' pens before purchasing.  Id.  The plaintiff, however, sought an accounting of defendant's profits from all of its sales of the infringing pens, not just those sold through telephone orders.  Id. at 1408.  The court rejected that claim as overreaching.  Id. at 1408. Here, too, plaintiffs are entitled only to defendant's profits from those sales made as a result

---

[14] It should also be noted that the Ninth Circuit has cautioned that a finding of "willful infringement may support an award of profits to the plaintiff, but does not require one." Faberge, Inc. v. Saxony Prods., Inc., 605 F.2d 426, 429 (9th Cir. 1979).

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    of the infringing trade dress.  Once plaintiffs have identified defendant's gross sales of the

2    infringing product, the defendant bears the burden of showing which of its total sales are not

3    attributable to the infringing activity, as well as costs and deductions from gross sales to

4    arrive at a profit figure.  15 U.S.C. 1117(a); Lindy Pen, 982 F.2d at 1408.  See also J. Thomas

5    McCarthy, McCarthy on Trademarks and Unfair Competition §§ 30:65-66.

6         At trial, the evidence will establish that a significant number of its sales of the

7    Thermos Work Series bottles were attributable to reasons other than the bottles' trade dress.

8    For example, the evidence will show that a significant number of purchasers bought Thermos

9    Work Series bottles because of the reputation of the Thermos brand name, the bottles' larger

10   storage capacity, the durability of the handles on the Work Series bottles, and the bottles' non-

11   skid bottoms.  Such sales must be deducted from the calculations of defendant's gross profits.

12   Likewise, Thermos will introduce evidence of the costs and overhead of producing the

13   challenged Work Series bottles.

14                    2.   Actual Damages

15        Plaintiffs also seek their lost profits due to lost sales and price erosion, as well as

16   corrective advertising expenses.  Plaintiffs are entitled to recover only those lost profits that

17   they would have earned "but for" the infringement.  See Lindy Pen, 982 F.2d at 1407.

18   Accordingly, the amount of lost profits may not be speculative.  Id.  See also McClaren v.

19   Plastic Indus., Inc., 97 F.3d 347, 361 (9th Cir. 1996) (reversing award of lost profits based on

20   value of business that plaintiff never started because it was based on speculation).   For

21   example, in Lindy Pen, the court's denial of an award of lost profits was based, inter alia, on

22   the plaintiff's failure to establish an appropriate base period of sales to compare with the

23   infringement period and to properly segregate those sales deemed infringing from those that

24   were not infringing.  982 F.2d at 1407.

25        Plaintiffs' theory of damages grossly overestimates the number of sales that they lost

26

DEFENDANT'S TRIAL BRIEF - 44
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1   directly as a result of competition from the Thermos Work Series Bottle.  The calculations of

2   lost sales by plaintiffs' damages expert, Richard Troxel, are fraught with unrealistic and

3   groundless assumptions.  For example, Troxel simply assumes that all sales of the Thermos

4   Work Series bottles are attributable to the infringement of plaintiffs' alleged trade dress and

5   that each sale of a Thermos Work Series bottle resulted in a loss of a sale of a Stanley bottle.

6   Yet the evidence at trial will show that there is no apparent correspondence between the

7   decline in sales of the plaintiffs' bottles and the introduction of the defendant's bottles.  The

8   evidence will show that plaintiffs' acquisition of the Stanley business in February 2002 and its

9   relocation of the Stanley bottle production from Nashville to China in the middle of that year

10  may have had a greater impact on plaintiffs' sales than the introduction of defendants' Work

11  Series bottles in August.  In addition, Mr. Troxel's damages are inflated because his estimated

12  sales of Work bottles for the period from January 2004 through July 2004 are more than 2.5

13  times defendant's actual sales.

14      DATED this 14th day of March, 2005.

15                              SCHIFF HARDIN LLP
                                Paula J. Morency
16                              Kevin J. Byrne
                                James A. Clark
17                              Sondra A. Hemeryck
                                6600 Sears Tower
18                              Chicago, IL  60606
                                Tel: (312) 258-5500
19                              Fax:(312) 158-5600

20

21                              s/Marc C. Levy
                                Marc C. Levy, WSBA # 19203
22                              PRESTON GATES & ELLIS LLP
                                925 Fourth Avenue
23                              Suite 2900
                                Seattle, WA 98104-1158
24                              Tel:  (206) 623-7580
                                Fax: (206) 623-7022
25                              marcl@prestongates.com

26                              Attorneys for Defendant
                                Thermos L.L.C.

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON  98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1

## CERTIFICATE OF SERVICE

2     I hereby certify that on March 14, 2005, I caused to be filed the document with the

3 Clerk of the Court, using the CM/ECF system which will send electronic notification of such

4 filing to the following:

5

6     David H. Binney:  daveb@prestongates.com

7     Kevin J. Byrne:  kbyrne@schiffhardin.com

8     James A. Clark:  jclark@schiffhardin.com

9     Mark S. Carlson:  carlson.mark@dorsey.com, otis.nicole@dorsey.com

10     Peter Scott Ehrlichman:  ehrlichman.peter@dorsey.com

11     Michael J. Folise:  mfolise@blacklaw.com

12     Marc C. Levy:  marcl@prestongates.com

13     Shannon Marie McMinimee:  mcminimee.shannon@dorsey.com

14     Paula J. Morency:  pmorency@schiffhardin.com

15     Jason M. Rhodes:  Rhodes.Jason@dorsey.com

16     E. Russell Tarleton:  rust@seedlaw.com

17

18

19                    s/Marc C. Levy
                      Marc C. Levy, WSBA # 19203
20                    PRESTON GATES & ELLIS LLP
                      925 Fourth Avenue
21                    Suite 2900
                      Seattle, WA 98104-1158
22                    Tel:  (206) 623-7580
                      Fax: (206) 623-7022
23                    marcl@prestongates.com

24                    Attorneys for Defendant
                      Thermos L.L.C.
25

26

DEFENDANT'S TRIAL BRIEF - 46
CV03-1261-JLR

PRESTON GATES & ELLIS LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022